THE STATE OF OHIO, DEPARTMENT OF SECURITIES, ET AL. *v.* AMERICAN EQUITEL CORPORATION ET AL.

(No. 76CV-05-1766—Decided February 2, 1979.)

Common Pleas Court of Franklin County.

8

*Mr. William J. Brown,* attorney general, and *Mr. W. Sean Kelleher* for plaintiffs.

*Mr. Lyman Brownfield* and *Mr. Larry McClatchey* for defendants.

PADDOCK (REFEREE). Pursuant to Civ. R 53 and the reference in this case the referee hereby renders the following findings of fact, conclusions of law and recommendation based on the evidence presented and the arguments of counsel.

*I. Introduction.*

On May 6, 1976 plaintiffs, as agencies and officials of the State of Ohio, filed this complaint seeking injunctive and other relief against corporate defendants, American Equitel Corporation (Equitel), Multi-Gard Insurance Agency, Inc. (Multi-Gard) and individual defendants, Thomas G. Jenkins, Kenneth Cole, Halden R. Gilliam and Genevieve Scott. Negotiations and court proceedings subsequent to the filing of the complaint lead to the sale of substantially all of Equitel's assets and the dissolution of Equitel as a corporation. The issue remaining, which was tried to this referee, was, should the defendants, particularly the individual defendants and especially Jenkins, be permanently enjoined from future violations of the securities laws of Ohio? Defendants have generally taken the position that violations of Ohio's securities laws did occur but in light of all the facts and circumstances, a permanent injunction is not warranted.

In addition, Huntington National Bank was a named defendant in this suit as it was then a major creditor of Equitel. Huntington, during the course of negotiations, was dismissed as a party. Defendant Jack Sommer died during the pendency of this case and the cause of action against him was not of a type that could be pursued against his estate. Defendant H. Wesley Robinson, about whom more will be heard *infra,* entered into a consent entry approved by the court and filed on April 19, 1978, which stated:

"***[I]t is hereby: ORDERED, ADJUDGED and DECREED that the Defendant H. Wesley Robinson, is hereby permanently enjoined from any future violations of the Ohio Securities Act, R. C. 1707.01 et. seq."

This case was heard by the referee in 4 days of trial on June 20, 21, 26 and 28, 1978.

*II. Findings of Fact—Parties and Corporate Background.*

1. At the time this complaint was filed, plaintiff, J. Gordon Peltier was Director of the Department of Commerce of the State of Ohio and was responsible, through the Division of Securities, for the enforcement of the Ohio Securities Act.

Plaintiff James S. Reece was the Commissioner of Securities, Chief of the Ohio Division of Securities and was directly responsible for the administration and enforcement of the Ohio Securities Act.

2. Equitel is a dissolved corporation, incorporated under Ohio law on January 14, 1974. According to the Amended Articles of Incorporation effective June 27, 1975, the stated purpose of Equitel was to own and operate all types of businesses including insurance companies, banking institutions, and manufacturing companies. Its principal place of business was 4926 Reed Road, Columbus, Ohio. With the consent of this court, Equitel was dissolved in 1976 and is now in the process of liquidation.

3. As of the date the complaint was filed, defendant Jenkins was the president, chairman of the board of directors and a substantial shareholder of Equitel. He was the original promoter of Equitel. Subsequent to September 24, 1976, pursuant to an agreement approved by this court and with plaintiff's consent, Jenkins sold the major portion of his stock. He has continued to function as a director and officer for the purpose of liquidation. Defendants Cole, Gilliam and Scott are directors of Equitel. Defendant H. Wesley Robinson is an attorney at law practicing in Ohio. At all times relevant to the complaint, he was legal counsel to Equitel. He served as an officer for a time. Defendant Multi-Gard is an affiliate of defendant Jenkins, who is its president and sole shareholder.

4. Equitel was the brainchild of Jenkins, who planned for it to organize or buy an insurance company emphasizing credit life, and health and accident insurance. In the pattern of another successful Ohio holding company he intended to emphasize stock sales to auto dealers who were in a position

to send insurance business to the insurance company subsidiary. Jenkins had developed experience and personal contacts in the credit life insurance market through the business dealings of Multi-Gard with various auto dealers in Ohio. Equitel was to operate as a holding company with its shares available for public sale as insurance companies could not sell stock in that manner.

5. On December 31, 1973, the Articles of Incorporation of Equitel were executed. The fourth article listed the total number of shares outstanding in all classes at 500. The Articles were not filed with the Secretary of State until January 14, 1974. Jenkins paid the initial organizational expenses and bought all of the initial 500 shares for a total price of $1,000.

6. Jenkins was introduced to Robinson by a bank officer. Robinson assured Jenkins that he could handle the legal matters of a corporation and showed Jenkins prospectuses which he had worked on for various other corporations. Jenkins, who is not an attorney, hired Robinson, who began work in late 1972 setting up the new corporation.

*Registration of Securities*

7. On January 24, 1974, Equitel filed a Form 3 (o), Claim For Exemption From The Registration of Securities with the Ohio Department of Commerce, (Division of Securities). The form listed 500 shares common stock, sold to Thomas Jenkins on January 14, 1974 at $2 per share. The form was not signed by Jenkins but was notarized by Robinson.

8. The initial plan of Jenkins, with some suggestions from Robinson, was for Equitel to issue two classes of stock, A and B. B shares were to be Founder's Shares, or perhaps a more pragmatic term, insider's shares, which would be less expensive, more closely held, convertible to A shares, and able to elect a majority of the members of the board of directors. Class A shares were to be more expensive, offered to the general public and able to elect one less than a majority of the Board members.

9. Under date of April 29, 1974, Equitel, by Jenkins as its president, with Robinson taking the acknowledgement as notary public and with Robinson listed as the "correspondent to whom communications regarding this application may be sent", executed an application on a Form 9 to qualify for sale 280,000 shares of Class A common. The application (registra-

tion statement) recited that Equitel was authorized to issue 500,000 Class B and 1,000,000 Class A common shares, of which 6,000 Class A and 109,625 Class B were then outstanding. The officers and directors were listed as Jenkins, Robinson, Donald Olds, and Cole. This Form 9 was filed with the Division of Securities on May 2, 1974.

10. On or about May 5, 1974 and by instruments bearing that date, the following actions were taken as evidenced by the corporate Minute Book and other documents:

a) The Equitel articles of incorporation were amended to authorize the issuance of 250,000 shares of Class B and 700,000 shares of Class A common;

b) Robinson was appointed statutory agent;

c) Jenkins subscribed to 6,000 shares of Class A and 109,625 shares of Class B common, Olds subscribed to 1,000 Class B shares and Robinson subscribed to 1,875 Class B shares, all at $1.60 a share;

d) Equitel accepted the subscriptions in an action signed by Jenkins as incorporator and designated the proceeds of the sale as stated capital;

e) Robinson, Jenkins and Olds signed a waiver of notice of shareholders' meeting;

f) Jenkins and Olds met as sole directors, pursuant to a waiver of notice, and elected Jenkins president and Olds secretary and treasurer;

g) By a separate written action elected Jenkins president and chairman of the board, Olds was elected secretary-treasurer and the actions of the incorporator (Jenkins) were ratified; and

h) Jenkins, Robinson and Olds as the sole subscribers for Equitel shares by written action amended the articles of incorporation of Equitel.

11. The documents described in Finding of Fact No. 10 were either drafted by Robinson or were forms filled in almost entirely in his hand, or both. Equitel minutes and written corporate actions were prepared by Robinson and the corporation record was kept in his office. The actions amending the Articles of Incorporation were kept by him after they were signed. Robinson did not file the amended articles of incorporation with the Secretary of State until June 27, 1975, some thirteen months later.

12. The amended articles of incorporation described in Findings of Fact No. 10 and No. 11 provided that the holders of Class B should elect a majority of the directors, and that each Class B share could be converted into two Class A shares, with no restriction as to time. In the course of the Form 9 registration Robinson had numerous contacts with the Division of Securities, making changes and furnishing supplemental information. The Division of Securities objected to the provision enabling the Class B shares to elect a majority of the directors. Robinson agreed to make the necessary changes to reduce the Class B directors to one less than a majority. He told Jenkins of the requirements, but he did not explain how the change was to be accomplished, nor did he take any steps to effect the change. He did amend the prospectus to indicate that the directors to be elected by the Class B shares were one less than a majority.

13. The answers to questions 7, 8, and 9, on the Form 9 supplied by Jenkins under oath were false and in fact all the information on the Form 9 was supplied before the events occurred.

*The Reed Road Property*

14. Jenkins and his wife (not a party to this case) owned land and a building at 4926 Reed Road in Columbus. Jenkins wanted to convey this property to Equitel in exchange for stock. At Robinson's suggestion, pursuant to what he reported to Jenkins as a request by the Division of Securities, Jenkins obtained an appraisal of the property by Robert Weiler, M. A. I. Based upon a $175,000 appraisal it was informally understood that Jenkins would receive 109,625 Class B shares.

15. In 1974 Jenkins Agency and Multi-Gard were doing a substantial agency business with Penn Security Life Insurance Company (Penn Security). The prospectus disclosed that the plan of Equitel was to own a life insurance company and to acquire the Jenkins - Multi-Gard agency business. Multi-Gard was substantially indebted to Penn Security for agency advances, much of which had been used to support the effort on behalf of Equitel which Multi-Gard was funding. To protect its interest, Penn Security requested that Equitel secure payment of the Multi-Gard debt (which was a general obligation not evidenced by a note) with a mortgage on

Equitel's Reed Road property. In sum, Equitel encumbered a valuable corporate asset to secure the operating debt of an insurance agency (owned by Equitel's majority stockholder), which was eventually intended to become an Equitel subsidiary.

16. A warranty deed was executed from Thomas and Edwina Jenkins to Equitel and witnessed by Robinson. However, this deed was not recorded until May 1, 1975, some thirty days after April 1, 1975, when Thomas Jenkins, as President of Equitel executed a Mortgage Deed to Penn Security in the amount of $133,867.61. Jenkins and Mrs. Scott knew of the mortgage, and acted on behalf of Equitel. The other directors testified that they could not recall authorizing granting the mortgage. Further, the mortgage itself was not recorded until October 22, 1975. Robinson prepared the necessary papers, acted as notary, and was responsible for filing the mortgage.

17. Robinson took no action to disclose the Penn Security mortgage in the prospectus or to inform the Division of Securities about it, nor did any officer or director of Equitel. Robinson did not advise Jenkins that the mortgage was improper or that its existence should be disclosed. Multi-Gard had been making and continued to make payments on the obligation. When Jenkins was advised by the Division of Securities that the mortgage was considered to be improper, he promptly arranged for it to be removed.

*Registration of Securities*

18. Robinson was the only legal counsel that Equitel had for obtaining the necessary registration for sale of Equitel stock under R. C. Chapter 1707. On October 22, 1974, a Form 39, Application for Qualification of securities previously sold was filed with the Division of Securities. The form was signed by Jenkins but was not notarized. The answer to question 7 of the form indicates that 3,836 shares of Class A common stock were sold at $8 per share. The answer to question 10 of the form indicated that no commissions were paid.

19. By a Form 39 dated December 13, 1974, and received by the Division of Securities on December 20, 1974, prepared by Robinson, signed by Jenkins and signed by Robinson as notary public, the earlier Form 39, was amended to register also the shares subscribed by Robinson, Jenkins and Olds.

14

The amendment recited that Equitel then had outstanding 21,000 Class A shares and that the shares thereby registered were 3,836 Class A at $8 a share, 6000 Class A at $1.60 a share, and 138,125 Class B at $1.60 a share. As amended the Form 39 registration was accepted effective February 24, 1975. This Form 39 registration qualified the shares sold prior to the filing date but did not register any shares prospectively for future sale.

20. Equitel's amended articles of incorporation providing for an election of a majority of the directors were filed as an exhibit to and a part of the Form 9 registration. As requested by the Division of Securities, the prospectus drafts submitted as a Form 9 exhibit to the Division of Securities as early as October 15, 1974 described the Class B shares as having power to elect one less than a majority of the directors. The Division of Securities approved the Form 9 application for registration on April 23, 1975 without an amendment to the Form 9 exhibit showing that the articles had been amended consistent with the change in the prospectus. April 23, 1975, the Form 9 Registration effective date, was the first time that the shares of Equitel could be sold to the general public. The offering circular in use at this time did not disclose the mortgage to Penn. Security. During the week of May 5, 1975 a letter was sent to the customers of Multi-Gard notifying them of the effective date of the registration.

21. On December 23, 1975, Equitel voluntarily suspended the sale of its shares, due to the change in circumstances resulting from its purchase of the Republic Franklin Life Insurance Co. (Republic), shares. On or about this time Jenkins assumed the presidency of Republic as well as that of Equitel and Multi-Gard. Except for the issuance of the stock dividend declared September 17, 1975 and the issuance of stock pursuant to the exercise of options granted prior to April 23, 1975, no Equitel shares were sold or issued after the voluntary suspension of sales in December 1975.

22. On March 23, 1976, the Division of Securities suspended the dealers license and the stock registration of Equitel making any further sales unlawful.

23. There is no evidence that any Equitel securities were sold other than the shares initially registered on a Form 3 (0); the shares registered on the Form 39 filed October 22, 1974,

amended December 20, 1974 and effective February 24, 1975; the shares registered on the Form 9 filed May 2, 1974, amended numerous times and finally effective April 23, 1975; and the shares issued pursuant to the exercise of stock options. In connection with the registration of shares on the Form 39 filed in October 1974 the buyers of the Equitel shares involved, other than Jenkins and Robinson, were offered an opportunity to rescind the purchase and be refunded their money. They all declined and signed written statements of non-prejudice. The Division of Securities order approving the Form 39 registration found that none of the buyers had been defrauded. There is no evidence that the Division of Securities began any proceeding to suspend or amend that finding, and there is no evidence that any such buyer was defrauded by such sale.

*Securities Sales: Licensing and Commissions*

24. Upon Robinson's suggestion, Equitel was on April 23, 1975 licensed by the Division of Securities to sell its own stock. Jenkins was licensed as its principal, failing the examination the first time he took it and passing the second time after instruction from a tutor suggested by Robinson. Robinson either supervised or himself attended to the licensing of Equitel and Jenkins Agency - Multi-Gard personnel, including Mrs. Scott, who obtained licenses as registered securities representatives of Equitel. Neither Cole nor Gilliam was ever licensed and neither of them sold any Equitel stock. As salesmen may only sell through a licensed dealer, April 23, 1975 was the first time that any of the salesmen could lawfully have sold shares.

25. After the Equitel Form 9 registration became effective on April 23, 1975, the Jenkins Agency-Multi-Gard office personnel and insurance sales and service personnel began work respectively managing the internal affairs of Equitel and selling its stock. Salaries, commissions and expenses could not be paid by Equitel because of the escrow restrictions. The Form 9 registration documents provided and the prospectus disclosed that Equitel would deduct 15 percent ($1.20 per share) of the proceeds of the sale of Class A shares to pay for expenses of sale. Jenkins intended that the Jenkins Agency - Multi-Gard personnel who worked on the stock sales would be compensated for their efforts as part of the sales ex-

pense and that they would use such compensation to buy Equitel stock at the "founders" price, $1.60 a share. In order to do this it was necessary to have a transaction which preceded the offering. On the other hand, at that time it was not known to whom and in what amount the sales would be made. After discussion between Robinson and the Division of Securities as to a proper nominee, Multi-Gard subscribed to 25,000 Class B and 15,000 Class A shares for this purpose. In effect, Multi-Gard became a trustee, holding (for later distribution) the right to receive shares. In order that the subscription obligation could be included as an asset on the Equitel balance sheet, the Division of Securities required Multi-Gard to acknowledge in writing the validity of the subscription as an obligation of Multi-Gard. All of the negotiations with the Division of Securities concerning the said shares were conducted by Robinson.

26. Robinson advised Jenkins that no sale took place until a share certificate was delivered. In reliance upon such advice, and using a subscription form prepared by Robinson, in the summer and fall of 1974 Equitel sold 3,836 shares to persons who were expected to become members of the Dealer's Council. This came to the attention of the Division of Securities. As a result, Robinson prepared an affidavit for Jenkins to sign, reciting lack of intent. By a letter dated October 21, 1974 and received by the Division of Securities on October 22, 1974, Robinson sought to register the 3,836 shares on a Form 39, prepared by him and signed by Jenkins for Equitel, but with the notarial acknowledgement omitted.

27. All of these sales in 1974 were made by individuals who were not licensed as securities salesmen. The underlying stock was not registered and the sales were made without the benefit of an offering circular. During 1974, a number of insurance salesmen of Multi-Gard sold securities without a dealer or salesmen's license. These sales were made pursuant to an oral understanding that the salesman would be compensated at a later date in an amount of 5 percent or less. The testimony was conflicting whether the commission would be paid in cash or stock. Jenkins was a party to the oral arrangement.

*The Prospectus*

28. A prospectus or offering circular is an integral part of securities sales such as Equitel was attempting. The prospectus as required by law, makes numerous disclosures to the prospective buyer so that he will hopefully make his decision on an informed basis. The Equitel prospectus, dated April 22, 1975, which was approved as part of the Form 9 registration contained the following material false and misleading statements and omissions:

a) The prospectus failed to disclose that the B shares would elect a majority of the directors. In fact, on page six it misstated this fact and falsely said that the A shares sold to the public would elect a majority. The amended Articles making that change were not filed with the Secretary of State until later.

b) The prospectus failed to disclose the mortgage on the company's major asset, the Reed Road property.

c) The prospectus on page 12, was misleading in that the section on compensation failed to disclose the oral commission arrangement.

d) The prospectus failed to disclose that at the time the offering became effective the deed transferring the Reed Road property to Equitel had not been filed with the County Recorder.

e) The financial statement used in the prospectus listed liabilities as $4,000 which statement became misleading when the mortgage, and the accrued commissions were added.

29. Throughout the Form 9 registration process exhibits which were a part of the Form 9 Application (principally the proposed prospectus) disclosed that more shares were outstanding than the 500 common shares registered on the initial Form 3 (0). For example, the prospectus draft received by the Division October 15, 1974 stated that 138,125 Class B and 21,000 Class A common shares were outstanding and that 20,000 options (without specifying the class of shares) had been granted. The printed prospectus stated at page 18 that 20,000 options for the purchase of Class B common shares had been granted.

30. Prospectus drafts filed with the Division of

Securities during the registration process disclosed that on December 31, 1974, Jenkins was the record owner of 6,000 shares of Class A and 110,000 shares of Class B. The amendment to the Form 39 disclosed that the 6,000 Class A shares were sold at $1.60 a share, which is $9,600. The prospectus at page 17 discloses that $8,600 of this amount was paid by means of the payment of organization expense for Equitel. The Form 3 (0) discloses that the remaining $1,000 was paid by Jenkins in cash when he bought the first 500 shares when Equitel was organized. The prospectus states at page 16 that on December 31, 1974 no Class A shares were outstanding. The Multi-Gard subscription was included in the 138,125 Class B and 21,000 Class A shares disclosed to the Division of Securities in the prospectus drafts filed from time to time as being outstanding.

31. The prospectus states at page 17 and the Form 9 Application on line four states that Equitel was incorporated on December 31, 1973. The Form 39 Application and the amendment thereto both state on line four that the date of incorporation was January 14, 1974, which is the correct date.

32. The Form 9 registration became effective April 23, 1975, and Robinson was so advised. Robinson made the arrangements for printing the prospectus. The prospectus printed at his direction carried a legend that it became effective April 22, 1975. The legal organization of Equitel, the registration of its shares and the preparation of all documents in connection therewith except the accounting, as to which he was the only significant contact, were entrusted fully to Robinson as counsel for the corporation. The prospectus which he prepared recited that he passed upon the validity of the securities offered.

After Equitel voluntarily suspended sales in December, 1975, arrangements were made for Haskins and Sells (another big eight accounting firm), who were the Republic Franklin Life Insurance Company (hereinafter RFL) auditors, to audit consolidated financials of Equitel and RFI, and Robinson began work on an amended prospectus.

*Escrow, Republic and the Loans*

33. The Division of Securities required Equitel to escrow the proceeds of the public sale of Class A shares until

$500,000 of such proceeds had been accumulated. An escrow for the funds was established at the City National Bank & Trust Company, Columbus, Ohio, from which funds could be drawn only with the consent of the Division of Securities after the funds escrowed reached $500,000. Robinson attended to the details of establishing such an escrow account.

The Division of Securities also required that the "founders shares" which were sold at $1.60 a share be held in an escrow account to insure their subordination to the Class A shares which were the subject of the public offering. Robinson made arrangements for such an escrow and drew subscriptions and subordination agreements which were used in selling such shares and placing them in escrow. The shares so sold are those which were the subject of the Form 39 filed by Robinson on October 22, 1974.

34. Negotiations conducted by Jenkins and Robinson over a considerable period of time culminated in December 1975 with the purchase by Equitel of stock of RFL, a Columbus, Ohio, based life insurance company. The stock was purchased from RFL and its parent corporation, Republic Franklin Insurance Company (hereinafter RFI). Robinson was legal counsel for Equitel in the negotiations and closing. Vorys, Sater, Seymour & Pease were legal counsel to RFL and RFI.

35. On December 15, 1975, the directors of Equitel met, the only meeting Cole and Gilliam recall attending prior to dissolution. The board approved the purchase of shares of RFL shares from RFI. The board authorized the purchase of 166,666 Class A shares and 33,333 B shares of RFL.

36. At that point in time it was necessary that two large bank loans be obtained to complete the deal. Jenkins needed to borrow money as an individual to purchase for his own portfolio another large block of Equitel Class A shares, in order to complete the escrow requirement of $500,000 worth of sales. As the purchase price of the RFL shares exceeded the $500,000 gained from the public sale of stock, Equitel as a corporation (with Jenkins as a guarantor) needed to borrow, in its own name, $100,000 to complete the purchase of RFL. The two loans are related, in that they were both executed on the same day and had the same ultimate purpose, Equitel's

acquisition of RFL, but the two loans were distinguished by separate terms, separate documents and different debtors.

37. Robinson made arrangements at the Huntington National Bank for Jenkins to borrow funds with which to buy approximately 14,000 Equitel Class A shares and for Equitel to borrow $100,000 to meet the cash requirements of the purchase. Robinson handled both loan closings, the release of the escrow funds by the Division of Securities, and the closing of the stock purchase. The agreement required Equitel to pledge all of the 166,666 class A shares and all of the 33,333 class B shares of RFL which Equitel was to acquire to secure the loan. The corporate records do not indicate any authorization for this encumbering of the shares.

38. The RFL shares bought by Equitel consisted of 33,333 Class B (of 66,667 outstanding) bought from RFI and 166,666 previously unissued Class A (of a total of 500,000 outstanding after the purchase) bought from RFL. RFI owned the remaining 33,667 Class B. The remaining Class A were distributed among a large number of public stockholders. The Class B shares elected 5 of 12 directors. At the time of the purchase, Equitel had more than 100 shareholders and the RFL stock constituted substantially more than one-half of the assets of Equitel.

39. When Jenkins bought Equitel stock in December, 1975, Robinson explained to him that pursuant to a custom in the industry, Jenkins, as a licensed securities salesman, was entitled to buy the stock at a price net of the sales commission to Equitel; that is, 85 percent of the issue price, which was the net proceeds to Equitel as described on the face of the prospectus. However, the loan at the Huntington National Bank was set up for a purchase at the gross price. Robinson explained the day of the closing that there was no time to redo the loan and that if Jenkins would close the loan as it was set up he could later take back the difference between the gross and the net price. The loan to Jenkins was executed on the gross basis. For this purpose on March 8 and March 29, 1976, Jenkins caused Equitel to issue checks for his benefit respectively to McDonald & Company for $7,300 and to Multi-Gard for $10,000. The check to McDonald was for

payment on Jenkins' personal margin account and the check to Multi-Gard was a loan from Jenkins.

40. On February 20, 1976, and March 12, 1976, Jenkins caused Equitel to issue checks to him respectively in the amounts of $191.29 and $389.83. Both checks were reimbursement for out of pocket expenditures made by Jenkins on behalf of Equitel.

41. The Division of Securities took the position that the acquisition of such a large block of RFL stock constituted a sufficient change of Equitel circumstances that Equitel should obtain new, consolidated financial statements and amend its prospectus. On behalf of Equitel, Robinson agreed voluntarily to suspend sales and so advised the Division in writing.

*The Dealer's Council*

42. Almost from the beginning of Equitel, there existed a group of automobile dealers from around Ohio with contacts with Jenkins and Equitel. This group eventually became known as the Dealer's Council, and was ostensibly formed to advise and counsel Equitel in its business and offer new ideas to Equitel's management. There was no evidence presented that the members of the Council were ever paid or compensated for their "consulting" work. It seems to this referee that the Dealer's Council was more in the nature of a sweetheart audience for eventual stock sales and credit life insurance business referrals. It should be noted that (1) there were some (but by no means all) Equitel stock sold to council members and (2) the Dealer's Council eventually bought the assets of Equitel during prior proceedings in this court.

43. In late March and early April, 1976, the Ohio Auto Dealers Association (OADA) was having a convention in Bermuda. Other credit life companies were to be on hand, and Jenkins arranged for some of the personnel who had been working on Equitel affairs to attend. Robinson arranged for the printing of a revised prospectus draft he had prepared and had it picked up by one Charles Corrigan, a Multi-Gard employee who had worked almost exclusively on Equitel business. Corrigan took the printed drafts to Bermuda. Another Multi-Gard employee, Carl Duckwald questioned

Robinson specifically by telephone about the propriety of displaying these drafts, and he assured those who asked that there were no impropriety, giving as one reason that Bermuda was beyond the jurisdiction of the Division. The draft copies of the prospectus were displayed and made available in the Equitel-Republic hospitality room. No witness, either a dealer or someone from Equitel, testified that the printed prospectus was actually read or picked up by any identified individual. However, it is clear from the expense and effort taken to transport the prospectuses from an Ohio printer by air to Bermuda, on time, and display them in the hospitality suite that it was intended by Jenkins, Robinson and the Multi-Gard employee-salesmen that dealers would pick up copies. It can be said that it is probable that some copies were indeed taken by unidentified dealers.

*Stock Dividend*

44. Approximately September, 1975, Robinson suggested to Jenkins that the declaration of a 10 percent stock dividend would be beneficial. He told Jenkins that he had had favorable experience with a similar stock dividend in connection with a bank holding company. Robinson thereafter discussed the dividend with the Division, obtained the approval of the Commissioner of Securities, so advised Equitel and prepared a sticker amendment describing the dividend, the sticker then being inserted in prospectuses used after that. On September 19, 1975, the company declared a stock dividend of 10 percent for Class A and B shareholders of recordas of January 30, 1976. The resolution was signed by Jenkins only.

*Stock Options*

45. After the approval of the Equitel Form 9 registration April 23, 1975, members of the Dealer's Council who shared in the 20,000 options described in the prospectus as having been granted began to exercise their options and buy stock. This continued until at least December 1975 and possibly January, 1976. Notwithstanding the description of these options in the prospectus, they were not mentioned in the printed portion of the Form 9 and the statements under sections 8 (securities outstanding), 9 (securities sought to be qualified for sale in Ohio), and 10 (securities sought to be

qualified for sale in Ohio and elsewhere) did not include the options or the Class B shares which were the subject of the options. As noted in Finding No. 21, *supra,* the stock options were exercised and stock dividends were issued *after* the voluntary suspension of sales in December, 1975.

*III. Conclusions of Law*

1. There is no question that various violations of the Ohio Securities Act, R. C. Chapter 1707, have occurred. Some violations were admitted in the answers filed by the defendants. The specific violations which the referee concludes did occur are:

a) Issuance of a prospectus containing false and misleading information on material matters in violation of R. C. 1707.44 (B) (1), (2) and (4).

b) Filing of false statements with the Division of Securities in the registration process, in violation of R. C. 1707.44 (B) (1) and (2).

c) Sale of unregistered securities in violation of R. C. 1707.44 (C) (1).

d) Sale of securities prior to the issuance of dealer's and salesmen's licenses, in violation of R. C. 1707.14 (A) and (B).

2. A major question in this case revolves around who is responsible for the violations listed *supra.* Defendants Cole, Gilliam and to some extent Scott, were not "insiders" to all the decisions, transactions, and occurances in the corporate life of Equitel. It is clear that Jenkins and Robinson were the individuals who really ran Equitel. Defendant Scott was closer to the day to day operation than Cole or Gilliam, who were basically outside directors. Defendants Cole and Gilliam attended very few Board of Directors' meetings (apparently because few, if any, were ever called by the President and Board Chairman, Jenkins) and only one meeting of significance, the December, 1975 meeting to approve the purchase of RFL. Defendant Scott helped keep the books of Equitel, supplied information as needed to Robinson, and signed checks and documents such as the mortgage to Penn Security.

However, the degree of involvement in operations of the corporation is not in and of itself dispositive of the question of a director's responsibility for securities violations. The question of knowledge is more significant.

R. C. 1707.29 provides:

"In any prosecution brought under sections 1707.01 to 1707.45, inclusive, of the Revised Code, the accused shall be deemed to have had knowledge of any matter of fact, where in the exercise of reasonable diligence, he should, prior to the alleged commission of the offense in question, have secured such knowledge."

Use of the words "prosecution", "accused" and "offense" seem to imply that this section applies to criminal cases, but as the Ohio Securities Act is a remedial law, this section should be construed liberally to include any litigation, not just criminal. R. C. 1.11. A similar presumption of knowledge in civil fraud actions is contained in R. C. 1707.41. Further, such a presumption of knowledge is consistent with a director's fiduciary duties to the shareholders and conducive to sound public policy in that it should encourage directors to become involved, knowledgeable, and alert to corporate wrongdoing rather than sitting back like the Three Monkeys, See No Evil, Hear No Evil, and Speak No Evil.

A similar high responsibility of care was placed upon directors, regardless of their length of tenure or status as inside or outside directors, in the leading federal case in this area, *Escott* v. *BarChris Construction Corporation* (S.D.N.Y. 1968), 283 F. Supp. 643. While this 55 page opinion is too lengthy to quote from here, the referee does find it persuasive and closely analogous to the case at bar.

Based upon R. C. 1707.29, 1707.41, and *BarChris, supra* the referee concludes that Cole, Gilliam, and Scott, by operation of law, had knowledge of and are therefore legally responsible for the securities violations in Conclusion Of Law No. 1, *supra.*

3. Applying the same statutory presumptions of knowledge and the reasoning of the *BarChris* case, there can be no question that Jenkins, who was the chairman of the board, president, founder, largest stockholder, chief operating officer of, and primary decision maker for Equitel, had knowledge of and responsibility for the above mentioned securities violations.

4. A major portion of Jenkins' defense is reliance upon Equitel's counsel, Robinson. While not exactly on point, *BarChris, supra,* does stand for the proposition that an officer,

director, attorney or auditor cannot rely upon the assertions of another officer or director as to corporate facts which go into a prospectus, when the relying individual has the means and the duty to obtain the true facts directly from corporate records and documents. Further, Ohio law, set out in R. C. 1707.41 provides for civil liability of a corporate director:

"***"

"Unless he shows that he had no knowledge of the publication [of a prospectus containing material falsehoods] complained of, or had just and reasonable grounds to believe the statement therein to be true.***"

and also that:

"***"

"Lack of reasonable diligence in ascertaining the fact of such publication or the falsity of any statement contained in it shall be deemed knowledge of such publication and of the falsity of any untrue statement in it."

The referee does find that Jenkins lacked reasonable diligence in learning the facts concerning several of the statements in the prospectus, and that his reliance on Robinson was not well founded, especially in light of the items in Finding of Fact No. 26, *supra,* where Robinson raised the ire of the Division of Securities through not properly defining "sale" of stock. That particular bungled definition, which lead to the sale of subscriptions of unregistered stock, would have been corrected had Robinson merely opened the Revised Code to section 1707.01 (C) (1) prior to advising Jenkins that a subscription is not a sale. This example of Robinson's ineptitude occurred in the fall of 1974, early on in this course of events. This plus the glaring non-disclosure of the mortgage on the Reed Road property in the Spring of 1975 should have alerted Jenkins as to the failings of Robinson as counsel.

The non-disclosure of the mortgage is particularly significant as any businessman knows that a mortgage is a liability. The prospectus had a balance sheet that did not list the mortgage as a liability. No legal conclusion, such as materiality, is involved in a balance sheet. Robinson prepared the prospectus, the mortgage should have been listed, it wasn't, and Jenkins, with actual knowledge of the creation and existence of the mortgage, should have known (1) the falsity of the statement in the balance sheet that liabilities equaled $4,000

accounts payable, and, (2) that Robinson included as a portion of the prospectus an erroneous balance sheet entry.

To reiterate, Jenkins has not proven his defense of reliance on counsel as his belief that the attorney was competent was not reasonable in light of the obvious errors that the attorney was making.

5. Equitel is a dissolved corporation and after this litigation (and one other case pending before Judge Martin) is completed, it will apparently cease to exist. A permanent injunction against further actions of something that will no longer have a legal existence is an exercise in futility. The requested injunction against Equitel should be denied on the basis that the court should not indulge in a vain and futile act.

6. As set out in part I. of this report, the main issue for determination here is the propriety of permanent injunction against defendants committing future violations of the securities laws of Ohio. The referee concludes, based on the evidence presented and the law discussed *infra* that permanent injunctions are not warranted.

R. C. 1707.26 provides:

"Whenever it appears to the division of securities upon complaint or otherwise, that any person has engaged in, is engaging in, or is about to engage in, any deceptive or fraudulent act, practice, or transaction, or in any act, practice, or transaction declared to be illegal, prohibited, or defined as fraudulent in sections 1707.01 to 1707.45, inclusive, of the Revised Code, the director of commerce may apply to a court of common pleas of any county in this state for, and upon proof of any of such offenses *such court may grant an injunction* restraining such person and its agents, employees, partners, officers, directors, and shareholders from *continuing, engaging in, or doing any acts in furtherance of,* such acts, practices, or transactions, and may order such other relief as the facts warrant." (Emphasis added.)

The referee considers the language emphasized *supra* to imply that an on-going or at least threatened course of conduct in violation of the law must exist before an injunction will issue. There is no evidence that defendants are "continuing" any violations. Indeed, Equitel is in a legal coma, bordering on legal death. There are no acts "in furtherance" of

anything in the securities business being conducted by the individual defendants.*

However, R. C. 1707.26 can be read "that [when] any person has engaged in***[any violations], the director of commerce may apply to a court of common pleas***and***such court may grant an injunction restraining such person***from***engaging in [any violations]." Such a reading could seem to authorize an injunction based on past acts alone without evidence of future propensities.

The referee does not consider such an interpretation to be correct. R. C. 1707.26 has not yet been interpreted by an Ohio court in a reported opinion. In the absence of Ohio precedent, the referee relies on *Rondeau* v. *Mosinee Paper Corp.* (1975), 422 U. S. 49 for the principle that securities regulation statutes which grant equitable jurisdiction to trial courts to enforce securities laws through injunctions do not abrogate traditional equitable principles guiding the court's use of its equity power. *Rondeau* involves Section 13 (d) of the Securities Exchange Act of 1934, as amended, which has no Ohio counterpart. The United States Supreme Court held, however, that (1) Section 27 of the Securities Exchange Act of 1934 (a grant of equitable jurisdiction to District Court, analogous to the grant in R. C. 1707.26) creates equitable power but does not mandate its exercise, (see *J. I. Case Co.* v. *Borak,* (1964), 377 U. S. 426); (2) traditional equitable principles, such as a showing of irreparable harm and an absence of an adequate remedy at law, still govern the issuance of injunctions within the securities regulation jurisdiction of the court and; (3) among other equitable principles, injunctions are designed to deter, not to punish violators of statutes, even when the public interest is involved as in the securities regulation field.

Applying the principles of *Rondeau* to the facts at bar, the referee concludes that the State, as plaintiff, has failed to meet its burden of proof as to showing irreparable harm from inadequacy of legal remedies for and a likelihood of occurance of future violations of Ohio's securities laws. There was no evidence that defendants, having been burned financially in

---

*See SEC v. National Student Marketing Corp. (1978), 457 F. Supp. 682 (U.S.D.C., D.C.).

the securities business, will again venture away from their prior habitats in the insurance and automobile businesses. See *Securities and Exchange Comm.* v. *Pearson* (C.A. 10, 1970), 426 F. 2d. 1339. The State did not show that existing securities laws would not provide adequate remedies for future violations, of whatever degree. There has been no showing that the public will be irreparably harmed by future conduct of the defendants or even that anyone was irreparably harmed by the multiple violations in the past. In short, the State has proved violations in the past but has not proven its case for remedies reaching into the future.

Further, the State has not proven scienter as to defendants, either for past acts or for anticipated future acts. The picture of defendants emerges as corporate klutzes and not crafty con-men. A combination of inexperience in the securities area and bad legal advice lead to the violations in this case. Some of the violations, such as the erroneous and inconsistent factual materials submitted to the Division of Securities, and the sale of subscriptions for unregistered stock, are the direct result of Robinson's errors and blunders. The defendants other than Robinson do remain responsible for the securities violations because of the various presumptions of knowledge and duties imposed by *BarChris, supra.*

But, as to remedy, there is some authority for the proposition that scienter or bad faith intent must be shown before an injunction will issue. See *Annotation:* 21 ALR Fed 582. The recent case of *Ernst & Ernst* v. *Hochfelder* (1976), 425 U. S. 185, is on point as it construes federal securities statutes to require a showing of scienter rather than mere negligence before remedies will be imposed when the statutes in question used language such as "manipulative or deceptive device or contrivance". The comparable Ohio statutes, R. C. 1707.26 (injunction against violations) and R. C. 1707.01 (J) (the definition of fraud, which is the applicable definition for later statutory sections) do refer to and incorporate the terms "deceptive or fraudulent acts", "fraudulent" and "false pretense", which seem to imply a need for a showing of scienter to justify the issuance of an injunction.

In summation, the State has failed to meet its burden of proof as to the basic equitable requirements of irreparable harm, and inadequacy of remedy at law and the requirement

of scienter which may be construed from the applicable statutes. Even if the court determines that scienter is not required by statute, the referee concludes that the absence of a showing of irreparable harm, and inadequate legal remedy is sufficient to justify the denial of permanent injunctions.

7. It should be noted parenthetically that the State did not call Robinson as a witness. Robinson would have been the person best able to shed light on the inner workings of Equitel once Jenkins had testified as to his version of events. Robinson would have been well qualified to demonstrate inconsistencies in Jenkins' story or show that Jenkins had a state of mind different from what he portrayed at trial. As the State did not call Robinson to the stand, the referee can only conclude that Jenkins did not have any fraudulent intent in many of the events in this case (such as the two bank loans with some proceeds going to Jenkins' personal use), which the State has tried to label as fraudulent or deceitful.

8. There is no showing of a need for a permanent injunction against Multi-Gard as it will seemingly remain only in the insurance business and the individual defendants had not been shown to be recidivists as to securities violations.

*Recommendation*

Therefore, based upon the Findings of Fact and Conclusions of Law, *supra,* the referee recommends that the court deny the requested permanent injunctions as to all defendants and enter final judgment for the defendants and against the plaintiffs.

FLOWERS, J. This case was tried to a referee of this court in June of 1978. The referee, after taking evidence and receiving post-trial submissions of both parties, issued his report on January 8, 1979. Both parties have filed objections to the report, accompanied by supporting memoranda. The matter is now before the court for review as the court does not feel the need for oral argument.

At the outset the court notes that none of the parties' objections deal with the Findings of Fact contained in the report. The court therefore affirms and accepts the Findings of Fact as stated and adopts those Findings as the findings of the court.

As to defendants' objections to Conclusions of Law Nos. 2, 3, and 4, the court overrules those objections. Defendants'

basic thrust in making those objections is that the conclusions are unnecessary or *dicta*. The court, however, concludes that those conclusions are indeed legally correct and necessary to a determination of the case against the less prominent defendants, Scott, Cole and Gilliam and are both important and legally correct as to the liability of the primary defendants, Jenkins and Equitel.

Plaintiff, the State, has objected to the conclusions on several grounds which boil down to a question of the standard to be applied when the state seeks a permanent injunction under the securities laws. The court has reviewed the conclusions of the referee and finds them to be supported by statutes and precedent and to be legally correct. The court hereby adopts as its own the Conclusions of Law and accepts the Recommendation based thereon. The objections of the plaintiff are overruled.

Therefore, it is ordered, adjudged and decreed that plaintiff's prayer for a permanent injunction be denied and that final judgment be and it hereby is entered for each and all of the defendants, and against plaintiffs.

*Judgment accordingly.*