# RONDEAU v. MOSINEE PAPER CORP.

No. 74–415.   Argued April 15, 1975—Decided June 17, 1975

*David E. Beckwith* argued the cause for petitioner. With him on the briefs were *Maurice J. McSweeney* and *Richard H. Porter.*

*Laurence C. Hammond, Jr.,* argued the cause for respondent. With him on the brief was *James A. Urdan.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in this case to determine whether a showing of irreparable harm is necessary for a private litigant to obtain injunctive relief in a suit

under § 13 (d) of the Securities Exchange Act of 1934, 48 Stat. 894, as added by § 2 of the Williams Act, 82 Stat. 454, as amended, 84 Stat. 1497, 15 U. S. C. § 78m (d). 419 U. S. 1067 (1974). The Court of Appeals held that it was not. 500 F. 2d 1011 (CA7 1974). We reverse.

## I

Respondent Mosinee Paper Corp. is a Wisconsin company engaged in the manufacture and sale of paper, paper products, and plastics. Its principal place of business is located in Mosinee, Wis., and its only class of equity security is common stock which is registered under § 12 of the Securities Exchange Act of 1934, 15 U. S. C. § 78l. At all times relevant to this litigation there were slightly more than 800,000 shares of such stock outstanding.

In April 1971 petitioner Francis A. Rondeau, a Mosinee businessman, began making large purchases of respondent's common stock in the over-the-counter market. Some of the purchases were in his own name; others were in the name of businesses and a foundation known to be controlled by him. By May 17, 1971, petitioner had acquired 40,413 shares of respondent's stock, which constituted more than 5% of those outstanding. He was therefore required to comply with the disclosure provisions of the Williams Act,[1] by filing a Schedule 13D

---

[1] The Williams Act added § 13 (d) to the Securities Exchange Act of 1934, which has been further amended to provide in relevant part:

"(d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78l (g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 5 per centum

with respondent and the Securities and Exchange Commission within 10 days. That form would have disclosed, among other things, the number of shares bene-

---

of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors—

"(A) the background and identity of all persons by whom or on whose behalf the purchases have been or are to be effected;

"(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price or proposed purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c (a) (6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

"(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

"(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the name and address of each such associate; and

"(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings

ficially owned by petitioner, the source of the funds used to purchase them, and petitioner's purpose in making the purchases.

Petitioner did not file a Schedule 13D but continued to purchase substantial blocks of respondent's stock. By July 30, 1971, he had acquired more than 60,000 shares. On that date the chairman of respondent's board of directors informed him by letter that his activity had "given rise to numerous rumors" and "seems to have created some problems under the Federal Securities Laws . . . ." Upon receiving the letter petitioner immediately stopped placing orders for respondent's stock and consulted his attorney.[2] On August 25, 1971, he filed a Schedule 13D which, in addition to the other required disclosures, described the "Purpose of Transaction" as follows:

> "Francis A. Rondeau determined during early part of 1971 that the common stock of the Issuer [respondent] was undervalued in the over-the-counter market and represented a good investment vehicle for future income and appreciation. Francis A. Rondeau and his associates presently propose to seek to acquire additional common stock of the Issuer in order to obtain effective control of the Issuer, but such investments as originally determined were and are not necessarily made with this objective in mind. Consideration is currently being given to making a

---

have been entered into, and giving the details thereof." 82 Stat. 454, as amended, 15 U. S. C. § 78m (d) (1).

The Commission requires the purpose of the transaction to be disclosed in every Schedule 13D, regardless of an intention to acquire control and make major changes in its structure. See 17 CFR §§ 240.13d–1, 240.13d–101 (1974).

[2] Although some outstanding orders were filled after July 30, 1971, petitioner placed no new orders for respondent's stock after that date.

"public cash tender offer to the shareholders of the Issuer at a price which will reflect current quoted prices for such stock with some premium added."

Petitioner also stated that, in the event that he did obtain control of respondent, he would consider making changes in management "in an effort to provide a Board of Directors which is more representative of all of the shareholders, particularly those outside of present management . . . ." One month later petitioner amended the form to reflect more accurately the allocation of shares between himself and his companies.

On August 27 respondent sent a letter to its shareholders informing them of the disclosures in petitioner's Schedule 13D.[3] The letter stated that by his "tardy filing" petitioner had "withheld the information to which you [the shareholders] were entitled for more than two months, in violation of federal law." In addition, while agreeing that "recent market prices have not reflected the real value of your Mosinee stock," respondent's management could "see little in Mr. Rondeau's background that would qualify him to offer any meaningful guidance to a Company in the highly technical and competitive paper industry."

Six days later respondent initiated this suit in the United States District Court for the Western District of Wisconsin. Its complaint named petitioner, his companies, and two banks which had financed some of petitioner's purchases as defendants and alleged that they were engaged in a scheme to defraud respondent and its shareholders in violation of the securities laws. It alleged further that shareholders who had "sold shares without

---

[3] Respondent simultaneously issued a press release containing the same information. Almost immediately the price of its stock jumped to $19–$21 per share. A few days later it dropped back to the prevailing price of $12.50–$14 per share, where it remained.

the information which defendants were required to disclose lacked information material to their decision whether to sell or hold," and that respondent "was unable to communicate such information to its stockholders, and to take such actions as their interest required." Respondent prayed for an injunction prohibiting petitioner and his codefendants from voting or pledging their stock and from acquiring additional shares, requiring them to divest themselves of stock which they already owned, and for damages. A motion for a preliminary injunction was filed with the complaint but later withdrawn.

After three months of pretrial proceedings petitioner moved for summary judgment. He readily conceded that he had violated the Williams Act, but contended that the violation was due to a lack of familiarity with the securities laws and that neither respondent nor its shareholders had been harmed. The District Court agreed. It found no material issues of fact to exist regarding petitioner's lack of willfulness in failing to timely file a Schedule 13D, concluding that he discovered his obligation to do so on July 30, 1971,[4] and that there was no basis in the record for disputing his claim that he first considered the possibility of obtaining control of respondent some time after that date. The District Court therefore held that petitioner and his codefendants "did not engage in intentional covert, and conspiratorial conduct in failing to timely file the 13D Schedule."[5]

---

[4] The District Court pointed out that prior to December 10, 1970, a Schedule 13D was not required until a person's holdings exceeded 10% of a corporation's outstanding equity securities, see Pub. L. 91–567, 84 Stat. 1497, and credited petitioner's testimony that he believed the 10% requirement was still in effect at the time he made his purchases. Indeed, the chairman of respondent's board of directors was not familiar with the Williams Act's filing requirement until shortly before he sent the July 30, 1971, letter.

[5] The District Court also concluded that respondent's management was not unaware of petitioner's activities with respect to its

Similarly, although accepting respondent's contention that its management and shareholders suffered anxiety as a result of petitioner's activities and that this anxiety was exacerbated by his failure to disclose his intentions until August 1971, the District Court concluded that similar anxiety "could be expected to accompany any change in management," and was "a predictable consequence of shareholder democracy." It fell far short of the irreparable harm necessary to support an injunction and no other harm was revealed by the record; as amended, petitioner's Schedule 13D disclosed all of the information to which respondent was entitled, and he had not proceeded with a tender offer. Moreover, in the view of the District Court even if a showing of irreparable harm were not required in all cases under the securities laws, petitioner's lack of bad faith and the absence of damage to respondent made this "a particularly inappropriate occasion to fashion equitable relief . . . ." Thus, although petitioner had committed a technical violation of the Williams Act, the District Court held that respondent was entitled to no relief and entered summary judgment against it.[6]

The Court of Appeals reversed, with one judge dissenting. The majority stated that it was "giving effect" to the District Court's findings regarding the circumstances of petitioner's violation of the Williams Act,[7] but

---

stock. It found that by July 1971, there was considerable "street talk" among brokers, bankers, and businessmen regarding his purchases and that the chairman of respondent's board had been monitoring them.

[6] The District Court also dismissed respondent's claims that petitioner had violated other provisions of the securities laws. Review of these rulings was not sought in the Court of Appeals, and they are not now before us.

[7] The Court of Appeals also agreed with the District Court that the disclosures in petitioner's amended Schedule 13D were adequate.

concluded that those findings showed harm to respondent because it "was delayed in its efforts to make any necessary response to" petitioner's potential to take control of the company. In any event, the majority was of the view that respondent "need not show irreparable harm as a prerequisite to obtaining permanent injunctive relief in view of the fact that as issuer of the securities it is in the best position to assure that the filing requirements of the Williams Act are being timely and fully complied with and to obtain speedy and forceful remedial action when necessary." 500 F. 2d, at 1016–1017. The Court of Appeals remanded the case to the District Court with instructions that it enjoin petitioner and his co-defendants from further violations of the Williams Act and from voting the shares purchased between the due date of the Schedule 13D and the date of its filing for a period of five years. It considered "such an injunctive decree appropriate to neutralize [petitioner's] violation of the Act and to deny him the benefit of his wrong-doing." *Id.*, at 1017.

We granted certiorari to resolve an apparent conflict among the Courts of Appeals and because of the importance of the question presented to private actions under the federal securities laws. We disagree with the Court of Appeals' conclusion that the traditional standards for extraordinary equitable relief do not apply in these circumstances, and reverse.

## II

As in the District Court and the Court of Appeals, it is conceded here that petitioner's delay in filing the Schedule 13D constituted a violation of the Williams Act. The narrow issue before us is whether this record supports the grant of injunctive relief, a remedy whose basis "in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc.* v. *Westover,* 359 U. S. 500, 506–507 (1959).

The Court of Appeals' conclusion that respondent suffered "harm" sufficient to require sterilization of petitioner's stock need not long detain us. The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party.[8] By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position. The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. Indeed, the Act's draftsmen commented upon the "extreme care" which was taken "to avoid tipping the balance of regulation either in favor

---

[8] The Senate Report describes the dilemma facing such a shareholder as follows:

"He has many alternatives. He can tender all of his shares immediately and hope they are all purchased. However, if the offer is for less than all the outstanding shares, perhaps only a part of them will be taken. In these instances, he will remain a shareholder in the company, under a new management which he has helped to install without knowing whether it will be good or bad for the company.

"The shareholder, as another alternative, may wait to see if a better offer develops, but if he tenders late, he runs the risk that none of his shares will be taken. He may also sell his shares in the market or hold them and hope for the best. Without knowledge of who the bidder is and what he plans to do, the shareholder cannot reach an informed decision." S. Rep. No. 550, 90th Cong., 1st Sess., 2 (1967).

However, the Report also recognized "that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management." Id., at 3.

of management or in favor of the person making the takeover bid." S. Rep. No. 550, 90th Cong., 1st Sess., 3 (1967); H. R. Rep. No. 1711, 90th Cong., 2d Sess., 4 (1968). See also *Electronic Specialty Co.* v. *International Controls Corp.*, 409 F. 2d 937, 947 (CA2 1969).

The short of the matter is that none of the evils to which the Williams Act was directed has occurred or is threatened in this case. Petitioner has not attempted to obtain control of respondent, either by a cash tender offer or any other device. Moreover, he has now filed a proper Schedule 13D, and there has been no suggestion that he will fail to comply with the Act's requirement of reporting any material changes in the information contained therein.[9] 15 U. S. C. § 78m (d)(2); 17 CFR § 240.13d–2 (1974). On this record there is no likelihood that respondent's shareholders will be disadvantaged should petitioner make a tender offer, or that respondent will be unable to adequately place its case before them should a contest for control develop. Thus, the usual basis for injunctive relief, "that there exists some cognizable danger of recurrent violation," is not present here. *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 633 (1953). See also *Vicksburg Waterworks Co.* v. *Vicksburg*, 185 U. S. 65, 82 (1902).

Nor are we impressed by respondent's argument that an injunction is necessary to protect the interests of its shareholders who either sold their stock to petitioner at predisclosure prices or would not have invested had they known that a takeover bid was imminent. Brief for

---

[9] Because this case involves only the availability of injunctive relief to remedy a § 13 (d) violation following compliance with the reporting requirements, it does not require us to decide whether or under what circumstances a corporation could obtain a decree enjoining a shareholder who is currently in violation of § 13 (d) from acquiring further shares, exercising voting rights, or launching a takeover bid, pending compliance with the reporting requirements.

Respondent 13, 20–21. As observed, the principal object of the Williams Act is to solve the dilemma of shareholders desiring to respond to a cash tender offer, and it is not at all clear that the type of "harm" identified by respondent is redressable under its provisions. In any event, those persons who allegedly sold at an unfairly depressed price have an adequate remedy by way of an action for damages, thus negating the basis for equitable relief.[10] See *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 595 (1952) (Frankfurter, J., concurring). Similarly, the fact that the second group of shareholders for whom respondent expresses concern have retained the benefits of their stock and the lack of an imminent contest for control make the possibility of damage to them remote at best. See *Truly* v. *Wanzer,* 5 How. 141, 142–143 (1847).

We turn, therefore, to the Court of Appeals' conclusion that respondent's claim was not to be judged according to traditional equitable principles, and that the bare fact that petitioner violated the Williams Act justified entry of an injunction against him. This position would seem to be foreclosed by *Hecht Co.* v. *Bowles,* 321 U. S. 321 (1944). There, the administrator of the Emergency Price Control Act of 1942 brought suit to redress violations of that statute. The fact of the violations was admitted, but the District Court declined to enter an injunction because they were inadvertent and the defendant had taken immediate steps to rectify them. This Court held that such an exercise of equitable discretion was proper despite § 205 (a) of the Act, 56 Stat. 23, 50

---

[10] The Court was advised by respondent that such a suit is now pending in the District Court and class action certification has been sought. Although we intimate no views regarding the merits of that case, it provides a potential sanction for petitioner's violation of the Williams Act.

U. S. C. App. § 925 (a) (1940 ed., Supp. II), which provided that an injunction or other order "shall be granted" upon a showing of violation, observing:

> "We are dealing here with the requirements of equity practice with a background of several hundred years of history. . . . *The historic injunctive process was designed to deter, not to punish.* The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied." 321 U. S., at 329–330. (Emphasis added.)

This reasoning applies *a fortiori* to actions involving only "competing private claims," and suggests that the District Court here was entirely correct in insisting that respondent satisfy the traditional prerequisites of extraordinary equitable relief by establishing irreparable harm. Moreover, the District Judge's conclusions that petitioner acted in good faith and that he promptly filed a Schedule 13D when his attention was called to this obligation [11] support the exercise of the court's sound judicial

---

[11] In its brief on the merits respondent argues that "genuine issues of material fact exist as to the knowledge, motives, purposes and plans in [petitioner's] rapid acquisition of" its stock and that, at the very least, the case should be remanded for trial on these issues. This point was not raised in the petition for certiorari or respondent's opposition thereto, nor was it made the subject of a cross-petition. Because it would alter the judgment of the Court of Appeals, which like that of the District Court had effectively put

discretion to deny an application for an injunction, relief which is historically "designed to deter, not to punish" and to permit the court "to mould each decree to the necessities of the particular case." *Id.*, at 329. As MR. JUSTICE DOUGLAS aptly pointed out in *Hecht Co.*, the "grant of *jurisdiction* to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances." *Ibid.* (emphasis in original).

Respondent urges, however, that the "public interest" must be taken into account in considering its claim for relief and relies upon the Court of Appeals' conclusion that it is entitled to an injunction because it "is in the best position" to insure that the Williams Act is complied with by purchasers of its stock. This argument misconceives, we think, the nature of the litigation. Although neither the availability of a private suit under the Williams Act nor respondent's standing to bring it has been questioned here, this cause of action is not expressly authorized by the statute or its legislative history. Rather, respondent is asserting a so-called implied private right of action established by cases such as *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964). Of course, we have not hesitated to recognize the power of federal courts to fashion private remedies for securities laws violations when to do so is consistent with the legislative scheme and necessary for the protection of investors as a supplement to enforcement by the Securities and Exchange Commission. Compare *J. I. Case Co.* v. *Borak, supra,* with *Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412

---

an end to the litigation, rather than providing an alternative ground for affirming it, we will not consider the argument when raised in this manner. See *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375, 381 n. 4 (1970); *Morley Constr. Co.* v. *Maryland Cas. Co.*, 300 U. S. 185, 191–192 (1937). Cf. *Wiener* v. *United States*, 357 U. S. 349, 351 n. (1958).

(1975). However, it by no means follows that the plaintiff in such an action is relieved of the burden of establishing the traditional prerequisites of relief. Indeed, our cases hold that quite the contrary is true.

In *Deckert* v. *Independence Shares Corp.*, 311 U. S. 282 (1940), this Court was called upon to decide whether the Securities Act of 1933 authorized purchasers of securities to bring an action to rescind an allegedly fraudulent sale. The question was answered affirmatively on the basis of the statute's grant of federal jurisdiction to "enforce any liability or duty" created by it. The Court's reasoning is instructive:

> "The power *to enforce* implies the power to make effective the right of recovery afforded by the Act. And the power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case. If petitioners' bill states a cause of action when tested by the customary rules governing suits of such character, the Securities Act authorizes maintenance of the suit . . . ." 311 U. S., at 288.

In other words, the conclusion that a private litigant could maintain an action for violation of the 1933 Act meant no more than that traditional remedies were available to redress any harm which he may have suffered; it provided no basis for dispensing with the showing required to obtain relief. Significantly, this passage was relied upon in *Borak* with respect to actions under the Securities Exchange Act of 1934. See 377 U. S., at 433–434.

Any remaining uncertainty regarding the nature of relief available to a person asserting an implied private right of action under the securities laws was resolved in *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375 (1970).

There we held that complaining shareholders proved their case under § 14 (a) of the 1934 Act by showing that misleading statements in a proxy solicitation were material and that the solicitation itself "was an essential link in the accomplishment of" a merger. We concluded that any stricter standard would frustrate private enforcement of the proxy rules, but Mr. Justice Harlan took pains to point out:

> "Our conclusion that petitioners have established their case by showing that proxies necessary to approval of the merger were obtained by means of a materially misleading solicitation implies nothing about the form of relief to which they may be entitled. . . . In devising retrospective relief for violation of the proxy rules, the federal courts should consider the same factors that would govern the relief granted for any similar illegality or fraud. . . . In selecting a remedy the lower courts should exercise " 'the sound discretion which guides the determinations of courts of equity,' " keeping in mind the role of equity as 'the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.' " 396 U. S., at 386, quoting *Hecht Co.* v. *Bowles,* 321 U. S., at 329.

Considering further the remedies which might be ordered, we observed that "the merger should be set aside only if a court of equity concludes, from all the circumstances, that it would be equitable to do so," and that "damages should be recoverable only to the extent that they can be shown." 396 U. S., at 388, 389.

*Mills* could not be plainer in holding that the questions of liability and relief are separate in private actions under the securities laws, and that the latter is to be determined according to traditional principles. Thus, the fact

that respondent is pursuing a cause of action which has been generally recognized to serve the public interest provides no basis for concluding that it is relieved of showing irreparable harm and other usual prerequisites for injunctive relief. Accordingly, the judgment of the Court of Appeals is reversed and the case is remanded to it with directions to reinstate the judgment of the District Court.

*So ordered.*

MR. JUSTICE MARSHALL dissents.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS joins, dissenting.

I dissent. Judge Pell, dissenting below, correctly in my view, read the decision of the Court of Appeals to construe the Williams Act, as I also construe it, to authorize injunctive relief upon the application of the management interests "irrespective of motivation, irrespective of irreparable harm to the corporation, and irrespective of whether the purchases were detrimental to investors in the company's stock. The violation timewise is . . . all that is needed to trigger this result." 500 F. 2d 1011, 1018 (CA7 1974). In other words, the Williams Act is a prophylactic measure conceived by Congress as necessary to effect the congressional objective "that investors and management be notified at the earliest possible moment of the potential for a shift in corporate control." *Id.,* at 1016. The violation itself establishes the actionable harm and no showing of other harm is necessary to secure injunctive relief. Today's holding completely undermines the congressional purpose to preclude inquiry into the results of the violation.