In the Matter of James A. HELINGER, Sr. d/b/a Jim Helinger, Sr. Companies, Debtor.

NATIONAL FOOTBALL LEAGUE PROPERTIES, INC., and Tampa Bay Area NFL Football, Inc. d/b/a "Tampa Bay Buccaneers", Plaintiffs,

v.

James A. HELINGER, Sr. d/b/a Jim Helinger, Sr. Companies, Defendant.

Bankruptcy No. 81–188.
Adv. No. 82–290.

United States Bankruptcy Court,
M. D. Florida,
Tampa Division.

June 17, 1982.

Dyches & Lazzara, Tampa, Fla., for plaintiffs.

Albert I. Gordon, Tampa, Fla., for defendant/debtor.

## ORDER ON PRELIMINARY INJUNCTION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case and the matter under consideration is a complaint which seeks a preliminary injunction against James A. Helinger, Sr., d/b/a Jim Helinger, Sr. Companies (Helinger), the Debtor involved in the above-captioned proceeding. The complaint is filed by the National Football League Properties (NFLP) and Tampa Bay Area NFL Football, Inc. d/b/a "Tampa Bay Buccaneers" (Buccaneers). The request for preliminary injunction was scheduled in due course at which time the Court heard testimony of witnesses and now having considered the record together with the proposed Findings of Fact, Conclusions of Law submitted by counsel for the respective parties now finds and concludes as follows:

The NFLP is a corporation jointly owned in equal shares by 28 Member Clubs of the NFL. It is a corporation organized and existing under the laws of the state of California and maintains its principal place of business at 410 Park Avenue, New York, New York. The Buccaneers is a Florida corporation and is the owner of a franchise located in Tampa, Florida of a professional football team known as the Tampa Bay Buccaneers. Helinger is a Debtor who originally sought relief under Chapter 13 of the Code but has not been able to achieve confirmation of his plan under that chapter and converted his case to a Chapter 11 case which is still pending. Helinger owns and operates a business enterprise located at 2646 Central Avenue, St. Petersburg, Florida and is engaged in the general advertising business. It appears from the record that the Member Clubs of the league, including the Buccaneers, adopted and have used, and still use, various names, terms, symbols, emblems, designs and colors and other identifying marks. Many of these have been registered in the United States Patent and Trademark Office under the provisions of the Lanham Trademark Act, § 1 et seq., 15 U.S.C. § 1051 et seq. Some of these items are also protected by similar provisions of various state laws under the common law trademark protection. The protection to Member Clubs extends to the names by which the Member Clubs are

known by the public, in this instance, the name Buccaneers, or Bucs, and the logos used by the Bucs identify the team by the helmet design and team colors. The Buccaneers did register certain of their trademarks under the provisions of federal and state laws. For instance, the Buccaneers obtained and hold a registration for the marks "Tampa Bay Buccaneers", "Buccaneers" and "Bucs". (Plf's Exh. 15, 16, 17, 20, 22, 23 & 24). The trademarks of the Buccaneers are known to the public, especially to the fans of the team but also to public in general who live in the Tampa, St. Petersburg metropolitan area. Due to extensive advertisement and promotions by the Member Clubs is magazines, newspapers, radio and television broadcasts and extensive television coverage, there is no doubt that these trademarks are well known to the public in general.

The NFLP was formed in 1963 for the purpose of representing Member Clubs and for the purpose of marketing commercially certain novelty items carrying the symbols, logos and colors of the respective clubs. In order to achieve this, each Member Club entered into an agreement with NFLP whereby each club licensed the NFLP to use their respective trademarks for commercial purposes and also to carry on certain other promotional activities on behalf of the Member Clubs. When the Buccaneers joined the National Football League in 1976, it also entered into such an agreement with NFLP. These agreements generally provide that NFLP has an exclusive right to use the trademarks of the Member Clubs for promotional purposes to protect the trademarks from infringement, dilution or misappropriation and generally to protect the interest of NFL and the Member Clubs by publishing catalogs and establishing promotional programs, approved by the Member Clubs. As a result of promotional activities of NFLP, the trademarks became commercially valuable. When the trademarks appear on articles of merchandise, members of the public perceive that such merchandise has been sponsored or authorized by the NFL and by the Member Clubs. Members of the public, especially football fans, who desire to associate themselves with the respective Member Clubs, purchase merchandise bearing the trademarks in the belief that the NFL and the Member Clubs approve of and vouch for the quality of such merchandise.

NFLP has entered into numerous agreements with manufacturers and distributors of articles of merchandise, by which it has licensed such manufacturers and distributors to use the trademarks in the advertising and sale of licensed goods, the quality of which is supervised and controlled by NFLP on behalf of the Buccaneers and the other Member Clubs. For example, NFLP has entered into agreements with manufacturers and distributors of such items as T-shirts, sweatshirts, football games, novelty items, sports equipment, home furnishings and other products for sale and distribution to the public.

NFLP has granted a number of licenses to third parties for the use of the trademarks on novelty items such as flying saucers, automobile license plates, bumper stickers, cigarette lighters, key chains, lamps, mugs and glassware (collectively "novelties"). All novelties produced and sold by third parties under license from NFLP are subject to the approval of NFLP, which sets quality standards with respect to such merchandise and which engages in other activities designed to insure that all novelties bearing the trademarks are of high quality and accurately depict the trademarks.

Novelties bearing the trademarks and manufactured by NFLP's licensees are made available for sale and are sold at various retail outlets throughout the United States, including many in the State of Florida and in the Tampa-St. Petersburg metropolitan area.

The Member Clubs have established a foundation known as NFL Charities, a charitable trust which provides funding to a wide variety of charities, including the United Way and like causes. Each Member Club, with the exception of the Oakland Raiders, has entered into agreements

whereby the royalty payments otherwise payable to the Clubs go instead to NFL charities. Tampa Bay signed a pledge agreement upon entry into the NFL in 1976 whereby it pledged its licensing revenues to NFL charities. NFLP's contributions to NFL charities amounted to approximately $1,400,000 in 1981. The sole source of revenue for NFL charities is royalty payments from the sale of licensed merchandise bearing the trademarks.

The record further reveals that Helinger did operate in the past a business which offered for sale, a variety of novelty items many of which bore the official team colors of the Buccaneers and its registered marks. There is no doubt that Helinger copied the trademarks and the official team colors of the club from licensed novelties such as bumper stickers, megaphones, license plates and flying saucers (frisbees). In addition to using the trademarks and colors of the Buccaneers, Helinger also identified the particular merchandise by his own signature. An investigator of the NFLP did, in fact, purchase these items from Helinger in March, 1982 and there is no question that Helinger is not now and has never been licensed by NFLP to use the trademark of the Buccaneers or the trademark of any other Member Club. Helinger also offered for sale and sold some licensed merchandise bearing the trademark of the Buccaneers and produced by third parties licensed by the NFLP.

When NFLP first learned about Helinger's activities in September, 1980, it demanded that Helinger cease or desist to sell any unlicensed merchandise carrying the trademark of the Buccaneers. Helinger refused to comply although at one time agreed in a telephone conversation that he would not sell any unlicensed merchandise. Upon promise of Helinger and upon relying on his statement that his company would be going out of business, NFLP agreed to settle the matter and sent a settlement agreement to Helinger for execution. Shortly after the settlement agreement was sent to Helinger, Helinger filed his petition under Chapter 13 and Helinger never returned an executed agreement. During the fall football season, Helinger continued to manufacture and sell novelty items bearing the trademark of the Buccaneers to retailers in the Tampa and St. Petersburg area. NFLP again demanded that Helinger cease and desist to sell unlicensed merchandise but Helinger never responded to the demand. However, there is no evidence in this record that Helinger is still engaged and will engage in the activity complained by NFLP that is in the manufacturing and selling of unlicensed merchandise. The fact of the matter is that there is no evidence in this record that Helinger has any unlicensed merchandise left in his possession, that is merchandise which carries the protected trademark, symbols and team colors of the Buccaneers.

These are the relevant facts as presented at the evidentiary hearing which, according to NFLP, justify the relief sought: the issuance of a preliminary injunction. In the trademark infringement case, the Plaintiff who seeks the injunctive relief must establish the following elements:

1. that there is a substantial likelihood that the Plaintiff will prevail on the merits;

2. that there is a substantial threat that the Plaintiff will suffer irreparable harm if the injunction is not granted;

3. that the threatened injury to the Plaintiff outweighs the threatened harm an injunction may cause to the alleged infringer; and

4. that granting the preliminary injunction will be in the public interest or granting the preliminary injunction will not disserve the public interest. *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185, 186 (11th Cir. 1982).

There is no question that Helinger did, in fact, copy the registered trademark of the Buccaneers, the official team colors and sold unlicensed merchandise. The difficulty with NFLP's position, however, is that injunctive reliefs operate prospectively and are designed to prevent future activity and not to punish past conduct. *Dombrow-*

*ski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) and *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). The fact alone that one infringed in the past furnishes insufficient basis to conclude that he will do so in the future unless enjoined. As noted earlier, in this instance, Helinger did sell unlicensed merchandise to the investigator of the Plaintiff on March 6 but there is no proof in this record that he still has unlicensed merchandise which he intends to sell. Moreover, the sales activities in this field basically do not commence until the Member Clubs open their training camps and put on their exhibition games. This will not occur until August. Thus, it is hard to conclude, based on the foregoing, that there is a threat of immediate harm to NFLP. Accordingly, to issue a preliminary injunction at this time is unwarranted.

Based on the foregoing, it is

ORDERED, ADJUDGED AND DE-CREED that the request for preliminary injunction sought by the Plaintiffs, National Football League Properties, Inc. and Tampa Bay Area NFL Football, Inc. d/b/a "Tampa Bay Buccaneers" against the Defendant, James A. Helinger, Sr., d/b/a Jim Helinger, Sr., Companies be, and the same hereby is, denied with prejudice. It is further

ORDERED, ADJUDGED AND DE-CREED that the final evidentiary hearing for permanent injunction and other relief be, and the same hereby is, scheduled to be heard before the undersigned on August 18, 1982 commencing at 2:00 p. m.