LANDGRAY ASSOCIATES and Graybar Building Company, Plaintiffs,

v.

450 LEXINGTON VENTURE, L.P., the Turner Corporation d/b/a Turner Construction Company, and the United States Postal Service, Defendants.

No. 91 Civ. 7807 (MGC).

United States District Court, S.D. New York.

April 3, 1992.

Wien, Malkin & Bettex by Marcia Kusnetz, New York City, for plaintiffs.

Stroock & Stroock & Lavan by Brian M. Cogan, Lisa B. Peck, New York City, for defendants 450 Lexington Venture, L.P. and Turner Corp.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. by Kathy S. Marks, Kay Gardiner, New York City, for defendant U.S. Postal Service.

## OPINION

CEDARBAUM, District Judge.

Plaintiffs Landgray Associates ("Landgray") and Graybar Building Company ("Graybar") seek an injunction compelling defendants 450 Lexington Venture, L.P. ("450 Lexington"), the Turner Corporation ("Turner"), and the United States Postal Service (the "Postal Service") to remove water cooling towers from a roof courtyard on the second story of a building located at 450 Lexington Avenue, New York, New York. The Postal Service, which removed this action to federal court, owns 450 Lexington Avenue, known as the Grand Central Post Office (the "Post Office"). Defendant 450 Lexington, a Delaware limited partnership, is the net lessee of a portion of the Postal Service property pursuant to a ninety-nine-year net lease. Plaintiff Landgray, a New York partnership, owns the land and the building at 420 Lexington Avenue, adjacent to the Post Office on its south side and known as the Graybar Building. Graybar, also a New York partnership, is the operating sub-sublessee of the Graybar Building.

450 Lexington has engaged defendant Turner, a New York corporation, to construct an office tower on top of the Post Office. In connection with this construction, defendants installed cooling towers on the Post Office side of the second-story courtyard formed by the Graybar Building setback and the Post Office setback. The cooling towers are to function as part of the Post Office's air circulation system, removing heat that develops inside the building.

Plaintiffs allege that placement of the cooling towers in the second-story courtyard violates an easement of light and air created by a 1932 indenture, as modified by a 1936 agreement between the parties' predecessors in interest. Defendants argue that a Postal Service mail conveyor structure that was maintained for more than ten years in the second-story courtyard extinguished or diminished the easement by adverse use for the prescriptive period. Defendants also contend that plaintiffs' equitable action is barred by laches.

In accordance with Fed.R.Civ.P. 65(a)(2) and with the consent of the parties, after expedited discovery, the evidence in this case was presented at a two-day consolidated bench trial and preliminary injunction hearing. At the request of plaintiffs, the trial began in the second-story courtyard. I examined the cooling towers, the markings remaining from the mail conveyor structure, and the Graybar Building's windows that face the cooling towers. The proceedings were then adjourned to the courthouse, where eight witnesses testified. After observing the demeanor of the witnesses and evaluating the plausibility and credibility of the testimony, and after reviewing the documentary evidence introduced at trial, I conclude that plaintiffs are not entitled to an injunction directing defendants to remove the cooling towers.

## THE FACTS

It is uncontested that defendants' installation of the cooling towers in the second-story courtyard violates the terms of the indenture which created the courtyard easement. The central issue is whether by building a conveyor structure, and maintaining it in the courtyard for more than

ten years, the Postal Service extinguished or diminished the easement by adverse use.

The parties first discussed the cooling towers during the summer of 1990. In July 1990, during the course of constructing the tower on top of the Post Office, Jeffrey Spiritos, project manager of 450 Lexington, became aware that additional structural supports might be needed to support the cooling towers which he planned to install in the second-story courtyard. (Tr. at 376.) He contacted Landgray to request permission to attach the cooling towers' structural supports to the shared "party" wall of the two buildings and to gain access to the Graybar Building during the installation. (Tr. at 377.)

On August 7, 1990, representatives of 450 Lexington, including Spiritos, met with representatives of the Graybar Building, including Charles McIntyre, vice-president of the general partner of Landgray Associates, and Steven M. Durels, a vice-president of Helmsley Spear Inc., the managing and leasing agent for the Graybar Building. (Tr. at 382.) Spiritos explained the placement of the cooling towers, answered questions concerning operation of the towers, and requested permission to make structural tie-ins to the party wall shared by the buildings. (*Id.*)

Spiritos testified that the meeting was limited to questions concerning the cooling towers and structural supports. (Tr. at 383.) It was his impression that if he answered these questions, 450 Lexington would be able to proceed with the structural supports for the cooling towers. (*Id.*)

McIntyre testified that he told Spiritos at this meeting that "not only would we not give permission to tie in the dunnage beams into the structure of the Graybar Building but that the cooling tower violated our light and air easement and we objected to the cooling tower." (Tr. at 20–21.) Durels, who was present throughout McIntyre's testimony, echoed McIntyre's testimony on this point. (Tr. at 11.) Durels testified that plaintiffs registered a "blanket objection" to installation of the cooling towers and told Spiritos that "we wouldn't permit anything like that." (Tr. at 86–87.)

Although Durels was a forthcoming witness as to some matters, on this point he appeared to be uncomfortable and guarded. I do not credit either McIntyre or Durels' testimony in this regard both because of their demeanor and because of the implausibility of the testimony in light of their subsequent conduct.

Following the August 1990 meeting, Spiritos wrote to Durels requesting written approval of "the work required for installing the cooling towers." (Defs.' Ex. M.) He received no response. (Tr. at 386.) In fact, despite receiving numerous phone messages from Spiritos, McIntyre failed to respond in any fashion and, after the August 1990 meeting, did not object orally or in writing to installation of the cooling towers. (Tr. at 39–40, 386.) McIntyre testified that he did not accept or return any of Spiritos' telephone calls because he was "busy with other things." (Tr. at 26–27.)

By letter dated September 26, 1990, Spiritos informed McIntyre and Durels that 450 Lexington had determined that the cooling towers could be installed without structural tie-ins to the Graybar Building. (Pls.' Ex. 16.) This letter also advised that "[w]e shall be proceeding with this work." (*Id.*) McIntyre received this letter but chose not to respond to it. (Tr. at 28.)

Defendants proceeded to install the cooling towers in early February 1991. (Tr. at 366.) McIntyre testified that he did not know until July 1991 that the towers had actually been installed. (Tr. at 29.) Durels, whose office was on the second story of the Graybar Building throughout 1991, (Tr. at 65), testified that he was unaware of the presence of the cooling towers in the second-story courtyard until the Graybar Building's vice-president of operations brought the matter to his attention, (Tr. at 67–8). Durels, however, could not recall when this occurred. (Tr. at 68.)

By letter dated August 15, 1991, nearly eleven months after 450 Lexington gave notice that it would proceed to install the cooling towers, and six months after the installation was completed, plaintiffs first objected in writing to the installation. (Pls.' Ex. 21.)

I find that at the August 1990 meeting, plaintiffs expressed concerns and raised questions about the cooling towers only in the context of whether to grant permission for the structural supports but that, prior to the August 1991 letter, plaintiffs did not object to installation of the towers in the second-story courtyard.

### The Easement

Landgray purchased 420 Lexington Avenue (the "Graybar parcel") in 1979. The bargain and sale deed conveys the easement of light and air created by a 1932 deed between the United States of America and the New York Central Railroad Company as modified by an agreement dated June 9, 1936. (Pls.' Ex. 10 at 25.)

Prior to 1932, the railroad owned both the Graybar parcel and 450 Lexington Avenue. In 1932, the railroad conveyed 450 Lexington Avenue to the United States of America. (Pls.' Ex. 2.) The United States, for itself, its successors, and assigns covenanted and agreed with the railroad, its successors, and assigns that:

> for the purpose of assuring light and air to the building upon [450 Lexington Avenue] and to the building upon the southerly adjoining premises of the [Graybar parcel] that the present court[yard] between the southerly wall of the existing building upon [450 Lexington Avenue] and the northerly line of the southerly adjoining premises of the [Graybar parcel] shall at all times remain open and unobstructed, and that any changes made in the existing building upon [450 Lexington Avenue] shall not decrease the area of the said court[yard] space.

(Pls.' Ex. 2 (the "1932 indenture").) The 1932 indenture also provided that any construction at 450 Lexington Avenue shall have a southerly wall set back at least 40 feet from the property line of the Graybar parcel. (*Id.*) The 1936 agreement between the United States, the railroad, and another party reduced the required setback from 40 feet to 19 feet, 4 inches. (Pls.' Ex. 3.) The terms of the 1936 agreement concerning the second-story courtyard easement have not been modified by any other agreements.

### The Conveyor Structure

Prior to 1972, the Postal Service operated and maintained a mail conveyor system which carried mail between the third floor and the basement of the Post Office. (Tr. at 237.) By 1972, the system was no longer operational (Tr. at 236), but the structure that housed the system remained in the courtyard until it was removed by defendants prior to installation of the cooling towers (Tr. at 385). Albert Andrews, who was a Postal Service mail handler, saw the conveyor system from inside the Post Office in 1967 and from the second-story courtyard in 1972. (Tr. at 234.) Joseph Peter Sala, who was a Postal Service maintenance mechanic, saw the conveyor system in late December 1971 or early January 1972. (Tr. at 205.)

The outdoor aspect of the system consisted of two rectangular sheds of corrugated metal which housed spiral chutes and were located adjacent to the Post Office at each side of the second-story courtyard. Two conveyors ran from east to west in the space between the sheds. (Pls.' Ex. E.) The conveyors were also enclosed, for protection against the weather, by a corrugated metal covering. (Tr. at 215.) The shed on the west side of the courtyard extended approximately eighteen feet out from the Post Office's south wall, was approximately 21 feet in length, and reached above the third floor of the Post Office (Tr. at 217), approximately two stories above the second-story courtyard (Tr. at 240). The shed on the east side of the courtyard had similar proportions except that it was somewhat shorter. (Tr. at 217.)

One conveyor emerged from the third floor of the Post Office, gradually sloped down in the outdoor courtyard area from the third floor to the second floor, and reentered the Post Office through the floor of the courtyard. (Tr. at 237) This conveyor carried mail downward and was affixed to the south wall of the Post Office. (Tr. at 224.) It was approximately 6 feet in width and extended the length of the courtyard. (Tr. at 225.)

A second conveyor carried mail upward from the Post Office basement, emerged from the floor of the courtyard at a point approximately 18 feet from the Post Office wall (Tr. at 226), gradually sloped upward in the courtyard area, and entered the Post Office around its second floor (Tr. at 225). The outside portion of this conveyor was approximately 40 feet long and 8 feet wide. (Tr. at 219.)

Excluding the second conveyor, the conveyor structure occupied a total volume of 28,974 cubic feet. (Tr. at 271.)

*The Cooling Towers*

Defendants installed three cooling tower cells in the western portion of the second-story courtyard in February 1991. The cooling towers use an evaporative process to "reject" heat into the atmosphere. (Tr. at 308.) "Condenser water pipes" connect the cooling towers to a refrigeration machine located on the fifth floor of the Post Office. (Tr. at 313.) Warm water produced by the refrigeration process flows through these pipes from the refrigeration machine to the cooling towers, is cooled by an evaporative process, and is recycled to the refrigeration machine. (Tr. at 313–314.) According to Spiritos, there would be considerable difficulty in now moving the towers to the roof of the Post Office tower or to another setback. (Tr. at 388–390.)

The cooling towers are approximately 22 feet, 9 inches in height, 15 feet shorter than the western shed of the previous conveyor structure. (Tr. at 272.) The entire volume of the rectangular space occupied by the towers is approximately 23,819 cubic feet. (Tr. at 270.) However, there is open space between sections of the towers and beneath the entire tower structure. Subtracting these open spaces, the volume of the towers themselves is approximately 8500 cubic feet. (Tr. at 271.) Thus, the cooling towers occupy less space in the courtyard than was previously occupied by the conveyor structure. Based on my observations at the site and the testimony and exhibits presented at trial, I also find that the cooling towers interfere less with the Graybar Building's light and air than

did the mail conveyor structure which was previously located in the courtyard.

Plaintiffs argue that even if the cooling towers do not occupy as much space as the conveyor structure, emissions from the towers will interfere with the Graybar Building's access to light and air. The cooling towers have not yet been put into operation. Plaintiffs presented Irwin Herbst, a consulting engineer with expertise in heating, ventilation, and air conditioning, who testified that the cooling towers, when operational, will take in air from the side and emit heated air and some water vapor from the top. (Tr. at 124.) Because the towers' intakes face the Graybar Building, Herbst hypothesizes that operation of the towers will create air currents which will force air down toward these intakes and will divert the towers' emissions toward the Graybar Building. (Tr. at 126–127.) Herbst also testified that the cooling towers will emit various chemicals contained in the water used by the cooling system, although he was not sure what chemicals would be used. (Tr. at 116.) Herbst believes that emissions from the towers will form a white, water-vapor plume which will produce droplets on the Graybar Building in warm weather and ice on its windows in cold weather. (Tr. at 130–131.)

Defendants' witness, Douglas Mass, the mechanical and electrical engineer who planned the towers and arranged for their installation, testified that evaporated water emitted by the towers would not contain any chemicals. (Tr. at 321.) Some chemicals that are used to prevent deterioration of the cooling system may be emitted in droplets of water on the towers themselves. (*Id.*) Even this "drift," however, would be minimal because the towers incorporate features which prevent discharge of droplets. (Tr. at 322.) In fact, similar cooling towers operating within three feet of an adjoining building at another location in New York have not caused any maintenance problem for the glass and steel curtain wall of the adjoining building. (Tr. at 324–325.)

Mass also testified that the cooling towers would only emit a visible water-vapor plume on days when the temperature is in the thirties or below. (Tr. at 327.) Even if a plume is visible, however, Mass believes that it will extend straight upward to a maximum of forty feet and will not bend toward the Graybar Building. (Tr. at 332, 344-5.) The plume would appear similar to a "wispy type of white cloud." (Tr. at 317.) Mass does not expect air entering the cooling towers to be drawn downward from above the buildings. (Tr. at 330.) Nor does Mass believe that ice could ever form on the windows of the Graybar Building, because the single-pane windows of the Graybar Building are warmed by indoor heat and can never become cold enough to support ice. (Tr. at 334.)

I find that Herbst's speculative predictions of the effect of the emissions on the Graybar Building's light and air are both unpersuasive and insufficient to establish a present violation of plaintiffs' easement.

## DISCUSSION

■ Plaintiffs contend that the cooling towers violate the Graybar Building's easement of light and air and that the Graybar Building will suffer irreparable harm as a result of the towers' presence and operation in the courtyard. Defendants' principal defense is that the Graybar Building's easement has been extinguished or diminished by the Postal Service's continuous adverse maintenance of the mail conveyor structure for more than ten years. Defendants have the burden of proving their adverse use by clear and convincing evidence. *See Van Valkenburgh v. Lutz*, 304 N.Y. 95, 98, 106 N.E.2d 28 (1952); *Rose Valley Joint Venture v. Apollo Plaza Assocs.*, —— A.D.2d ——, 576 N.Y.S.2d 943, 944 (3rd Dep't 1991).

■ Under New York law, which all parties agree governs the substantive issues in this case, an easement created by grant may be extinguished by adverse use. *Spiegel v. Ferraro*, 73 N.Y.2d 622, 626, 541 N.E.2d 15, 16, 543 N.Y.S.2d 15, 16 (1989). Extinguishment by adverse use differs from extinguishment by abandonment in

that it does not require that the easement owner specifically intend to relinquish its rights in the easement. Instead, the focus is on the nature of the use by the owner of the burdened property. A party seeking to extinguish an easement by adverse use must establish by clear and convincing evidence that the use of the easement has been adverse to the owner of the easement, under a claim of right, open and notorious, exclusive, and continuous for a period of 10 years. *Spiegel*, 73 N.Y.2d at 626, 541 N.E.2d at 16, 543 N.Y.S.2d at 16; *see also* N.Y. Real Property Law § 501; Restatement of Property § 506 (1944).

Plaintiffs, citing *Parker & Edgarton v. Foote*, 19 Wend. 309 (N.Y.1838), *Cohan v. Fleuroma, Inc.*, 42 A.D.2d 741, 346 N.Y.S.2d 157 (2d Dep't 1973), *Pica v. Cross County Construction Corp.*, 259 A.D. 128, 18 N.Y.S.2d 470 (1st Dep't 1940) and *Blair v. 305–313 E. 47th St. Assocs.*, 123 Misc.2d 612, 474 N.Y.S.2d 353 (Sup.Ct.N.Y.Cty. 1983), argue that a light and air easement can neither be acquired nor extinguished by adverse use. While these cases support the proposition that easements of light and air cannot be created by adverse use, they do not support plaintiffs' contention that they cannot be extinguished by adverse use.

■ Negative easements, such as easements of light and air, generally cannot be acquired by prescription because the use required for creation of a prescriptive easement must be wrongful with respect to the property burdened by the easement, that is, adverse. *See Restatement of Property* § 458 cmt. e. Adverse use of an affirmative easement, such as a right-of-way through an adjacent property, is an invasion of the adjacent property, gives notice of the user's claim, and injures the owner by making the owner's interest in the property less valuable. By contrast, access to the surrounding air and use of light from the sun does not diminish these benefits to the adjacent property owner or give notice of any claim antagonistic to the burdened property. With respect to negative easements such as light from *"windows* overlooking the land of another, the injury, if

any, is merely ideal or imaginary." *Foote,* 19 Wend. at 315 (emphasis in original). There is "no *adverse user,* nor indeed any use whatever of another's property; and no foundation is laid for indulging any presumption against the rightful owner." *Id.* (emphasis in original). Thus, an easement of light and air cannot be acquired by adverse use because one can never *adversely* use the light and air from an adjacent property.[1]

■ This principle, however, has no application to extinguishment or diminution of an existing easement of light and air. In contrast to mere use of light and air, which confers no notice of claim against or harm to the adjacent property, obstruction of an existing light and air easement immediately causes injury as well as notice of adverse claim.

In *Lewis v. New York & Harlem Railroad,* 162 N.Y. 202, 222, 56 N.E. 540 (1900), the New York Court of Appeals held that where a railroad structure had impaired a light and air easement for the prescriptive period, the owner of the easement could no longer object to the presence of the original structure or to any new structure erected in the same place which inflicted no more injury than the old. The court noted that if the new structure is no "greater burden than the old [, the easement owner is] entitled to no relief whatever." *Id.* at 227, 56 N.E. 540.

■ The Postal Service's conveyor structure in the courtyard was visible to plaintiffs and their predecessors in interest from at least 1967 until 1989. The large corrugated metal structure occupied a portion of the courtyard exclusively. As in *Lewis,* this "obstruction was not out of view or knowledge, but in plain sight of the abutting owners, who by making no objection, acquiesced in the situation." *Lewis,* 162 N.Y. at 224, 56 N.E. 540. Thus, the Postal Service's maintenance of the convey-or structure in the easement area was open, notorious, and continuous since at least 1967.

■ The final element of adverse use, hostile use under a claim of right, may be presumed if all the other elements are established by the party claiming adverse use. *Di Leo v. Pecksto Holding Corp.,* 304 N.Y. 505, 512, 109 N.E.2d 600 (1952). In such a case, proof of open, notorious, and continuous use casts the burden upon the party opposing adverse use to show that the use was actually by license. *Di Leo,* 304 N.Y. at 512, 109 N.E.2d 600. Although the presumption of hostile use has most recently been applied in the context of prescriptive creation of right-of-way easements, *see Di Leo v. Pecksto Holding Corp.,* 304 N.Y. 505, 512, 109 N.E.2d 600 (1952), *McClean v. Ryan,* 157 A.D.2d 928, 550 N.Y.S.2d 184, 186 (3d Dep't 1990), and *Brocco v. Mileo,* 144 A.D.2d 200, 535 N.Y.S.2d 125, 127 (3d Dep't 1988), the theory behind the presumption is not limited to that context. In 1860, the New York Court of Appeals examined the problem of proving hostile use under claim of right. In *Hammond v. Zehner,* 21 N.Y. 118 (1860), the court considered whether evidence that a dam had openly, notoriously, and continuously flooded adjacent land was sufficient to establish adverse possession of the land. The court reasoned that "the object of the law in requiring that possession or user should be adverse, is that the person against whom the claim is made or the right is exercised, should be made aware of the fact so as to give him an opportunity of legally resisting before the time for doing so ... expires." *Hammond,* 21 N.Y. at 119–20. Because notice of the hostile claim is the linchpin of adverse use, the *Hammond* court inquired,

> [W]hat manifestation of claim could the defendant employ other than the very act

---

**1.** In rejecting the seventeenth-century English doctrine of "ancient lights"—implied easements for light and air—American courts have also expressed the developmental concern that the doctrine "cannot be applied in the growing cities and villages of this country." *Foote,* 19 Wend. at 318. While this concern militates against creation of light and air easements by adverse use, there is no similar public policy reason for preventing extinguishment of light and air easements. Indeed, the same public policy reason would favor permitting extinguishment of light and air easements.

of which the plaintiff complains.... [I]f there were any other method in which his adverse claim could be indicated, other than the express verbal assertion of it, could any be more effectual for the purpose of inducing the plaintiff. to assert his rights than the continual overflow of his lands for three and twenty years? It was in its very nature hostile to the rights of the plaintiff; it was an open and constant injury to him.

Although the Postal Service, like the defendant in *Hammond,* never expressly announced that the installation and maintenance of the conveyor structure in the courtyard was intended to be hostile, the Postal Service's installation and open, notorious, and continuous maintenance of this structure in the second-story courtyard may be presumed to have been hostile and under claim of right.[2]

This presumption may be rebutted by evidence that the open, notorious, and continuous use was actually by license or in subordination to plaintiffs' rights. Plaintiffs, however, do not claim and did not introduce any evidence to show that they or their predecessors in interest ever granted permission to the Postal Service to erect and maintain the conveyor structure in the courtyard. Instead, plaintiffs, quoting a phrase from *Lewis,* 162 N.Y. at 222, 56 N.E. 540, argue that a court must as a matter of law presume that the Postal Service had an "honest" rather than hostile purpose in erecting the mail conveyor structure in violation of plaintiffs' and their predecessors' easement. (Pls.' Ltr. Br. of 1/13/92 at 3.)

In *Lewis,* however, the court did not presume an "honest" purpose with respect to the easement of light and air that benefited

the abutting property, and held that the easement was diminished by the adverse use of the New York and Harlem Railroad. The court differentiated between the railroad's adverse use with respect to the abutting property owner and its use by license with respect to the City of New York. The court reasoned that the railroad's use was by license with respect to the city because the city had granted the railroad express permission to use the land under a resolution which recited that the city retained ownership of the land. *Lewis,* 162 N.Y. at 220–21, 56 N.E. 540. In addition, the railroad had expressly covenanted with the city that if it were permitted to occupy the land in question it would remove its railroad whenever the city required it. *Id.* The fact that the railroad later acquired a disputed deed from a previous owner was of no import because, without a specific communication of hostile intent, "its possession [was] presumed to be in accordance with [the earlier] agreement" by which the city gave permission for the railroad's use. Thus, the *Lewis* court concluded that "[w]he the occupant is in possession under two instruments, one subservient and the other hostile to the true owner, such possession, in the absence of positive notice to the contrary, will be regarded as subservient only, for the law raises a presumption in favor of an honest and against a dishonest purpose." *Id.*

In contrast to the railroad's position with respect to the city in *Lewis,* the Postal Service obstructed the second-story courtyard without any permission either oral or written. Unlike the railroad, the Postal Service did not erect the conveyor structure with the easement owner's permission

---

**2.** The principle that adverse use must afford notice of an antagonistic claim is illustrated by an exception to the presumption of hostile use. If a right-of-way easement exists on paper but has never actually been used, a hostile claim may be inferred only after the easement owner requests that the adverse user remove the obstruction and the adverse user refuses. *Castle Associates v. Schwartz,* 63 A.D.2d 481, 407 N.Y.S.2d 717, 723 (1978); *Spiegel,* 73 N.Y.2d at 627, 541 N.E.2d at 17, 543 N.Y.S.2d at 17. *See also Welsh v. Taylor,* 134 N.Y. 450, 459, 31 N.E. 896 (1892) ("as long as there was no occasion

for [easement owners] to use [the easement] the mere existence of a gate was not notice of any adverse claim.") The Graybar Building's light and air easement, however, not only existed on paper but also was utilized by the Graybar Building's owners whose windows opened to the light and air protected by the indenture. When the Postal Service installed the conveyor structure, plaintiffs' predecessors lost their previously unimpaired enjoyment of light and air which the indenture granted but the structure impaired.

and did not agree to remove the conveyor structure at the easement owner's request. Plaintiffs point only to the July 1987 net lease between the Postal Service and 450 Lexington to support their contention that the Postal Service "disclaim[ed]" hostile use under a claim of right or maintained the conveyor structure with the understanding that the Postal Service's use was subordinate to plaintiffs' and their predecessors' rights. The net lease lists the indenture granting the light and air easement under "permitted encumbrances" upon the Postal Service. (Pls.' Ex. 12, App. B.) This *pro forma* recital is not equivalent to the city resolution in *Lewis* because it does not mention permission or consent of plaintiffs or their predecessors to the erection or maintenance of the conveyor structure. Furthermore, the net lease is an agreement between the Postal Service and its lessee, to which plaintiffs were not parties.

Plaintiffs also point to several cases which establish that failure of an easement owner to use an easement created by grant is not, by itself, sufficient to establish the easement owner's intention to abandon the easement. A claim of abandonment, as opposed to a claim of adverse use, focuses upon the intention and acts of the easement owner rather than the party claiming extinguishment. In *Josh v. Nobile*, 1 Misc.2d 396, 145 N.Y.S.2d 422 (Sup.Ct.Monroe Cty. 1955), the court held that an easement owner whose predecessor in interest obstructed his own driveway easement with his house and cherry tree had not lost the right to enforce the easement. Similarly, in *Welsh v. Taylor*, 134 N.Y. 450, 31 N.E. 896 (1892), an alleyway easement was held not to have been abandoned although the easement owner's predecessors had erected a high fence and a building along the alley which had no openings through which access could be had to the alley.

Neither *Josh* nor *Welsh*, however, concerns adverse use. In *Josh* the court pointed out that there was no evidence of an adverse claim. *Josh*, 1 Misc.2d at 398, 145 N.Y.S.2d 422. In *Welsh*, the court declined to consider adverse use because it was not pleaded. *Welsh*, 134 N.Y. at 458, 31 N.E. 896. Although the party claiming abandonment in *Welsh* had installed a gate, the court primarily analyzed this obstruction as evidence of the intention of the easement owner. Because there was no evidence that the gate actually excluded the easement owner or even violated the terms of the easement, the easement owner's failure to object to it was not evidence of an intention to abandon. *Id.*

In *DeJong v. Abphill Assocs.*, 121 A.D.2d 678, 504 N.Y.S.2d 445 (2d Dep't 1986), another case relied on by plaintiffs, the court also noted a servient tenement's obstruction of an easement, but only to determine the issue of abandonment by the easement owner and not with respect to adverse use.[3]

Plaintiffs also argue, citing *Remsen v. Wingert*, 112 A.D. 234, 98 N.Y.S. 388 (1st Dep't 1906), *aff'd*, 188 N.Y. 632, 81 N.E. 1174 (1907), that when defendants temporarily removed the conveyor structure from the courtyard, plaintiffs' light and air easement was as a matter of law restored to its original full and unencumbered state. *Remsen*, however, which is an abandonment case, concerns only the effect of an easement owner's failure to use an easement of light and air which the burdened property owner had done nothing to obstruct. *Remsen* was a suit for specific performance of a contract for the purchase of a building. The purchaser had refused to perform because a search of the title disclosed an old easement protecting windows on the east side of the adjacent building. The easement owner was not a party to the suit. For many years the building on the adjacent property did not have windows on its east side. It was replaced by a new building with numerous windows on the east side. Adverse use was not at issue because the owner of the burdened property had never obstructed the easement owner's light and air, even during the period of non-use. The court held that it

---

**3.** It is not apparent from the court's opinion in *DeJong* whether the obstruction had even been in existence for ten years, the time period required to establish adverse use.

would not "force a party to take title where doubtful questions of law and fact exist concerning it, and all the parties who have a right to be heard upon that question are not before the court." *Id.*, 98 N.Y.S. at 391.

In this case, defendants removed the conveyor structure in order to install the cooling towers. The suspension of adverse use for a period of months, after decades of continuous adverse use, does not operate to restore the full easement to plaintiffs. *See Lewis*, 162 N.Y. at 228, 56 N.E. 540 (removal of one railroad structure, followed immediately by the erection of another, did not revive the portion of the easement extinguished by adverse use).

Plaintiffs correctly point out that the Postal Service's adverse use of part of the courtyard does not entirely extinguish the Graybar Building's light and air easement. In *Lattimer v. Livermore*, the court considered whether a nine-foot extension of a house extinguished an expansive easement "for light, air and vision" created by grant. 72 N.Y. 174, 182 (1878). The *Lattimer* court reasoned that the easement owner had not lost the entire easement because the "fact that she chose to give up part of her easement, did not authorize the owners of the [adjoining] lots to deprive her of the whole." *Id.* at 183. Instead, the court held that the earlier house extension had "extinguished a portion of the plaintiff's easement" and modified the judgment to allow the defendant to extend his own house "to the same extent and height" as the earlier obstruction. *Id.* at 183–84.

Similarly, in *Lewis*, the court reasoned that although the plaintiff could "claim no damages on account of any new structure erected in the same place, within the same lines, and for the same purpose, which inflicted no more injury upon her property than the old," the defendants "could make no further encroachment without liability." 162 N.Y. at 224–25, 56 N.E. 540. Although the cooling towers do not serve the same purpose as the conveyor structure and are within slightly different lines, they are sufficiently similar in volume and location, and obstruct light and air to a lesser degree than the previous structure. Thus, plaintiffs' easement has been diminished by adverse use to the extent of the previous structure but it has not been entirely extinguished. Plaintiffs retain the balance of the easement and the judgment in this case does not entitle defendants to encroach further.

A party seeking a permanent injunction must demonstrate the absence of an adequate remedy at law and irreparable harm if such relief is not granted. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975); *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir.1989). To establish irreparable harm, plaintiffs must demonstrate an injury that is actual and imminent rather than remote or speculative. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989). Plaintiffs' claim that the cooling towers will emit vapor which will impair the easement beyond the physical presence of the towers is, at present, too speculative to support a finding of irreparable harm.

Because I have concluded that defendants' installation of the cooling towers does not violate plaintiffs' remaining easement, I do not reach the issue of whether plaintiffs' substantial delay in objecting to the presence of the cooling towers has caused prejudice sufficient to constitute laches which would bar injunctive relief.

## CONCLUSION

The foregoing shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52, and my reasons for denying an injunction.

SO ORDERED.