**GULF CORPORATION and Gulf Oil Corporation, Plaintiffs,**

v.

**MESA PETROLEUM CO., Mesa Asset Co., Mesa Offshore Co., Sunshine Mining Co., First City Properties, Inc., Drexel Burnham Lambert Inc., Defendants.**

**MESA PETROLEUM CO., Mesa Asset Co. and Mesa Offshore Co., Counterclaim and Third Party Plaintiffs,**

v.

**GULF CORPORATION, Gulf Oil Corporation, James E. Lee, Edward B. Walker, III, Edwin I. Colodny, R. Hal Dean, Robert Dickey, III, Julian Goodman, J. Peter Gordon, Harold H. Hammer, James H. Higgins, Jerry McAfee, Edwin Singer and James M. Walton, Counterclaim and Third Party Defendants.**

Civ. A. No. 84–75–WKS.

United States District Court, D. Delaware.

March 8, 1984.

**1112**

Lewis S. Black, Jr., William O. LaMotte, III, A. Gilchrist Sparks, III, Thomas Reed Hunt, Jr., Lawrence A. Hamermesh, Jack B. Blumenfeld, Michael Houghton, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., John L. Warden, Robert C. Bata, Sullivan & Cromwell, New York City, Robert A. Nailling, Pittsburgh, Pa., for plaintiffs.

Charles F. Richards, Jr., E. Norman Veasey, Stephen E. Herrmann, William J. Wade, Jesse A. Finkelstein, Samuel A. Nolen, Richards, Layton & Finger, Wilmington, Del., for defendants.

Lawrence C. Ashby, Ashby, McKelvie & Geddes, Wilmington, Del., Raymond L. Falls, Jr., Charles A. Gilman, Kenneth E. Meister, Joseph I. Loonan, Cahill Gordon & Reindel, New York City, for Drexel Burnham Lambert Inc.

Robert K. Payson, Potter, Anderson & Corroon, Wilmington, Del., for First City Properties, Inc.

## OPINION

STAPLETON, Chief Judge:

This action was commenced on February 10, 1984, by Gulf Corporation, a Delaware corporation, and Gulf Oil Corporation, a Pennsylvania corporation (collectively, "Gulf"). Gulf's complaint names as defendants Mesa Petroleum Co., Mesa Asset Co. and Mesa Offshore Co., each of which is a Delaware corporation (collectively, except where the context otherwise requires, "Mesa"); Sunshine Mining Co., a Delaware corporation ("Sunshine"); First City Properties, Inc., a Delaware corporation ("First City"); and Drexel Burnham Lambert, Inc., a registered broker-dealer ("Drexel"). The complaint alleges violations of Sections 9, 13(d) and 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78i, 78m(d) and 78n(e), and the rules and regulations promulgated thereunder.

On February 13, 1984, Gulf moved for the issuance of a temporary restraining order enjoining defendants from taking certain actions. On February 14, 1984, the Court denied the motion.

On February 15, 1984, the Mesa defendants filed their Answer, Counterclaim and Third-Party Complaint naming Gulf and the members of its board of directors as counterclaim and third-party defendants. On February 17, 1984, the Mesa defendants amended and supplemented their counterclaim and third-party complaint and, on February 25, 1984, again supplemented their counterclaim and third-party complaint. The amended and supplemental counterclaim and third-party complaint allege violations of Sections 9(a), 10(b), 13(e), 14(a), 14(d) and 14(e) of the Exchange Act, as well as violations of Delaware law.

On February 22, 1984, Mesa issued a press release announcing its intention to commence a cash tender offer at $65 per share for up to 13.5 million shares of common stock of Gulf (the "Tender Offer"). After the close of business on that day, Gulf moved for the issuance of a tempo-

rary restraining order enjoining defendants from commencing their Tender Offer. Gulf's motion was denied.

This matter is presently before the Court on the motion of the Mesa defendants for a preliminary injunction requiring the Gulf defendants to (a) file certain publications and press releases with the SEC pursuant to the proxy rules, (b) amend its Schedule 14D–9 to include additional and corrected information, and (c) give five days advance notice to Mesa and the Court of any "purely defensive," extraordinary corporate transactions.

## I. THE PARTIES

Gulf is a holding company organized to hold the shares of Gulf Oil, an integrated petroleum company. Gulf has approximately 165,000,000 shares of common stock, held by approximately 300,000 shareholders. Gulf common stock is listed and traded on the New York Stock Exchange and other major stock exchanges.

Mesa Petroleum, Mesa Asset and Mesa Offshore have their principal offices in Amarillo, Texas. Mesa Asset and Mesa Offshore are both wholly-owned subsidiaries of Mesa Petroleum.

Mesa, Sunshine, First City, Far West Financial Services Corp., First City Trust Company, First City Financial Corporation, Ltd., Wagner & Brown and Harbert International, Inc. are members of a group commonly called the Gulf Investors Group ("the Group").

Counterclaim and third-party defendants James E. Lee, Edward B. Walker, III, Edwin I. Colodny, R. Hal Dean, Robert Dickey, III, Julian Goodman, J. Peter Gordon, Harold H. Hammer, James H. Higgins, Jerry McAfee, Edwin Singer and James M. Walton are members of the Gulf board. Messrs. Lee, Walker and Hammer are the Chairman of the board, President and Executive Vice-President, respectively, of Gulf.

## II. THE BACKGROUND

### 1. Formation Of The Group

Between August 11, 1983 and September 28, 1983, Mesa acquired an aggregate of 8,200,000 shares of Gulf in transactions on the New York Stock Exchange. On October 5, 1983, Mesa entered into an Investors Agreement with the other members of the Group and pursuant thereto sold to the other members of the Group an aggregate of 2,758,183 of the shares it had previously purchased between August 11, 1983, and September 28, 1983. The members of the Group committed an aggregate of $1.1 billion for the purchase of shares, of which $960.5 million has been invested to date.

From October 5, 1983, through October 14, 1983, the members of the Group, severally, purchased an aggregate of 6,300,000 additional shares, resulting in total ownership of 14,500,000 shares (or approximately 8.75% of the total outstanding shares). On October 17, 1983, the members of the Group filed with the SEC a statement on Schedule 13D reflecting their ownership of shares.

### 2. The Reincorporation Proposal And The December 2, 1983 Meeting

On October 11, 1983, Gulf announced that its board of directors had adopted a proposal to reorganize Gulf as a wholly-owned subsidiary of a newly formed Delaware corporation, with each of the shares to be automatically converted into one share of stock of the Delaware holding corporation (the "Reincorporation Proposal"). Gulf called a special meeting of stockholders to be held on December 2, 1983 to vote on the Reincorporation Proposal.

The Schedule 13D filed on October 17, 1983, revealed to Gulf management the identity of the persons who had been accumulating shares of Gulf. Immediately thereafter Gulf publicly announced that it "specifically rejected the ... [Mesa] program" and that creation of a royalty trust, part of Mesa's program, was not in Gulf's best interest or those of its stockholders "because of tax issues."

The members of the Group decided to solicit proxies in opposition to the Reincorporation Proposal. The Group stated that it opposed the Reincorporation Proposal because, among other things, it would elimi-

nate certain stockholder rights, the elimination of which would impair the ability of stockholders to communicate with the management of Gulf regarding proposals to enhance stockholder value.

Between mid-October and December 2, 1983, Gulf management and the Group engaged in a vigorous proxy context. The stockholders meeting took place on December 2, 1983, at which time the members of the Group owned an aggregate of 21,276,800 shares. The Reincorporation Proposal received the favorable vote of approximately 52.5% of the outstanding shares and was effected on January 18, 1984.

After the stockholders meeting and through December 28, 1983, the members of the Group purchased an aggregate of 457,900 additional shares. Since December 28, 1983, there have been no purchases of shares by any member of the Group. At this time, the Group owns 21,734,700 shares, or 13.2% of the total outstanding, which were acquired at an aggregate cost of $960,500,000.

### 3. The Royalty Trust Proposal

On December 30, 1983, the Group presented a specific written proposal (the "Royalty Trust Proposal") to the Gulf board that Gulf create and distribute to its stockholders units of beneficial interest in a royalty trust comprised of (1) a net profits interest consisting of at least 50% of the aggregate present value of the estimated future net revenues, before federal income taxes, attributable to all its U.S. proved domestic oil and gas reserves, computed in accordance with SEC guidelines, and (2) a 5% gross overriding royalty interest in its unproved U.S. acreage. One unit in the royalty trust would be distributed with respect to each outstanding share and the units would be transferable independently of the shares. On January 10, 1984, Gulf rejected the Royalty Trust Proposal as being "contrary to the best interests of [the Company's] stockholders."

In a December, 1983, "special issue" of the *Gulf Oilmanac,* a Gulf periodical, Mr. Lee, Gulf's chief executive officer, was reported to have "strongly criticized the roy-

alty trust concept advocated by the Mesa Group" and to have stated: " 'This is not a new idea. We have studied the concept carefully for years. Our conclusion is that it would cripple this Company and severely penalize the majority of our shareholders.' "

During January 1984, the Group began to discuss with representatives of Drexel the feasibility of raising financing for a possible cash tender offer for control of Gulf, and the basis upon which it might be possible to raise various amounts of financing for such a project. Drexel contacted over two hundred entities to inquire whether they would be interested in participating in the financing of a Mesa tender for Gulf stock.

On January 22, 1984, Mr. Lee met in Denver with Robert O. Anderson, Chairman of ARCO. At the meeting Anderson suggested that a combination of ARCO and Gulf would be one of the best companies in the industry, while making it clear that ARCO would be the survivor. Mr. Lee replied that Gulf was not interested in any combination where it was not the survivor and that he would prefer to have Gulf remain an independent corporation.

On February 1, 1984, Mr. Anderson called Mr. Lee and informed him that he had spoken with Mr. T. Boone Pickens, Mesa's Chief Executive Officer, about a possible acquisition of Gulf by ARCO. Mr. Anderson told Mr. Lee, among other things, that he had specifically referred to a $70 per share price for Gulf in his conversation with Mr. Pickens.

On February 6th, Mr. Pickens met with Mr. Lee in Pittsburgh. Mr. Pickens asked what Mr. Lee thought of the ARCO proposal. Mr. Lee told Mr. Pickens that his objective was to stay independent. Mr. Pickens stated that he thought more than $70 per share was probably available in a transaction with ARCO.

By February 7th or February 8th, Gulf's investment bankers had obtained and passed on to Gulf a copy of a Preliminary Acquisition Analysis distributed by Drexel

for the purpose of ascertaining whether financing would be available for a cash tender at $55 per share for enough shares of Gulf to bring the Group's holdings to over 50 percent.

### 4. Other Events Giving Rise To This Action

On February 10, 1984, Gulf announced in a press release that it had commenced this lawsuit "charging [the Group] with market manipulation and other violations of securities laws" with respect to an alleged "scheme" to take control of Gulf. In a February 14th press release, Gulf denied that Atlantic Richfield Company ("ARCO") had offered a business combination with Gulf at $70 per share and intimated that rumors in the press that such an offer had been made were spread by the Group to manipulate the market. In a subsequent letter to Gulf shareholders dated February 17, 1984, Mr. Lee stated that Mesa was engaged in a "scheme" "to seize control of your company."

On February 22, 1984, Mesa issued a press release which provided in part:

Mesa Petroleum Company (NYSE) announced today that it and the other members of the Gulf Investors Group intend to make a cash tender offer at $65 per share for up to 13.5 million shares of common stock of Gulf Corporation. Mesa noted that the members of the Group currently own 21.7 million Gulf shares, or 13.2% of the total outstanding. If an additional 13.5 million shares are tendered and purchased pursuant to the planned offer, the members of the Group would own 35.2 million Gulf shares, or 21.3% of the total outstanding.

At 5:30 P.M. that same day, Gulf moved for a temporary restraining order seeking to enjoin the Tender Offer.

On February 24, the Group disseminated its offer to purchase and commenced the Tender Offer. As disclosed in the offer to purchase, the purpose of the Tender Offer was to increase the equity interest of the members of the Group in Gulf and thereby to enhance the Group's ability to seek control of Gulf. It was the intention of the Group to seek control of Gulf by causing its designees to be proposed for election to the Gulf board at the 1984 annual meeting of stockholders.

On February 24, 1984, Gulf filed a Schedule 14D–9 Solicitation/Recommendation Statement with the SEC. The Schedule 14D–9 stated that, at a meeting that same day, the Gulf board had unanimously determined that the Tender Offer was "unfair and inadequate and not in the best interests of the Company or its stockholders." Through the Schedule 14D–9, an accompanying cover letter and a press release, the Gulf board recommended that Gulf's shareholders reject the Tender Offer and not tender their shares. Gulf also stated that it had authorized its legal and financial advisors to "explore all alternatives," but did not state that any negotiations were then under way.

The Schedule 14D–9, cover letter and press release did not disclose any negotiations between Gulf and ARCO. Further, none of these documents disclosed the fact that Mr. Hammer had exercised stock appreciation rights ("SARs") with respect to 95,000 shares at $57 per share on February 10th or that Mr. Walker had exercised SARs with respect to 160,000 shares in October or November, 1983, at $47 per share.

In addition to recommending rejection of the Tender Offer, the Schedule 14D–9 also disclosed the adoption of various amendments to the 1974 and 1983 Stock Option Plans of Gulf and Gulf's Supplemental Pension Plan which, as amended, provide benefits in the event of a "change in control." Further, Gulf's Schedule 14D–9 states that the Human Resources Committee of the board awarded grants under Gulf's Incentive Compensation Plan, in the amount of $7,158,900, and set aside $7,203,100 for additional grants contingent upon a change in control.

### III. MESA'S CLAIMS UNDER SECTION 14(a)

Mesa argues, with substantial record support, that Gulf's management viewed

its victory in the December 2, 1983 proxy contest as only the end of round one and immediately embarked on a stockholder relations campaign to lay the foundation for an expected proxy fight in connection with Gulf's 1984 annual meeting. As a part of that campaign, according to Mesa, Gulf published materials between early December 1983 and mid-February 1984 calculated to disparage the Mesa Group and to improve the image of Gulf's management.

While in its Schedule 13D filings Mesa had expressly disavowed any interest in a new proxy fight as of the time of these Gulf publications, it nevertheless takes the position that Gulf violated Section 14(a)[1] by failing to clear these publications in advance with the SEC. Mesa relies upon authority such as *Trans World Corp. v. Odyssey Partners*, 561 F.Supp. 1315, 1319 (S.D.N.Y.1983) where the Court observed:

> As defined in Rule 14a–1, 17 C.F.R. § 240.14a–1, the term "solicitation" includes, *inter alia*, any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." ... [A] communication to stockholders may constitute a proxy solicitation, even if it does not contain an express request for a proxy, if it is "part of 'a continuous plan' intended to end in solicitation and to prepare the way for success.

■ I assume without deciding that Mesa has shown a likelihood of success on this Section 14(a) claim. It does not follow, however, that it is entitled to interim relief. The purpose of Section 14 is to assure that stockholders have sufficient reliable information to make an informed decision between competing proxy solicitations. Even if one assumes that there will be a proxy fight in May in connection with Gulf's annual meeting, any suggestion that Gulf's

February publications will have an effect on stockholders' decisions at that time is too speculative to warrant injunctive relief. I so conclude not only because the challenged publications are removed in time from the annual meeting but also because they add little to what had already been said about Mesa and royalty trusts in the proxy fight preceding the December 2nd meeting and because any additional impact they might have will undoubtedly be dissipated by the discourse in connection with Mesa's tender offer. As for the possibility of additional "proxy solicitations" by Gulf, the fact that the February publications were not filed at a time when Mesa had expressly disavowed interest in a proxy contest provides no indication of what Gulf will do in the context of a threatened proxy battle.

The Supreme Court has made clear that those requesting injunctive relief in the context of alleged violations of the federal securities laws must "satisfy the traditional prerequisites of extraordinary equitable relief by establishing irreparable harm." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1974). Since I perceive no threatened irreparable injury based upon from Gulf's February publications, preliminary injunctive relief on Mesa's Section 14(a) claim will be denied.

## IV. MESA'S CLAIMS UNDER SECTION 14(d) AND RULE 14d–9

Mesa alleges that Gulf violated Section 14(d) of the Exchange Act of 1934, 15 U.S.C. § 78n, and Rule 14(d)(9) promulgated thereunder. Section 14(d)(4) provides:

> (4) Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regula-

---

1. Section 14(a) provides:
   (a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may pre-

scribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

tions as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78n(d)(4). Pursuant to this authority, the SEC adopted Rule 14d–9, which provides, in part:

§ 240.14d–9 Solicitation/recommendation statements with respect to certain tender offers.

(a) Filing and transmittal of recommendation statement. No solicitation or recommendation to security holders shall be made by any person described in paragraph (d) of this section [which includes the company whose securities are the subject of a tender offer] with respect to a tender offer for such securities unless as soon as practicable on the date such solicitation or recommendation is first published or sent or given to security holders such person complies with the following subparagraphs.

(1) Such person shall file with the Commission eight copies of a Tender Offer Solicitation/Recommendation Statement on Schedule 14D–9 (§ 240.14d–101), including all exhibits thereto....

\* \* \* \* \* \*

(c) Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1, 2, 3(b), 4, 6, 7 and 8 of Schedule 14D–9 (§ 240.14d–101) or a fair and adequate summary thereof: *Provided, however*, That such solicitation or recommendation may omit any of such information previously furnished to security holders of such class of securities by such person with respect to such tender offer.

17 C.F.R. § 240.14d–9. Mesa points to five actions taken by Gulf during the events in question that allegedly violated Section 14(d) and Rule 14D–9.

■ First, Mesa says that Gulf's press release of February 14, 1984 declared Gulf's opposition to Mesa's contemplated $55 per share offer and, that since there was no Schedule 14D–9 filing in connection with that declaration, the release constituted a violation of Rule 14(d)(4). The February 14th press release reads in part:

PITTSBURGH, PA, February 14, 1984—The Gulf Corporation Board of Directors today confirmed its firm opposition to the partial tender offer for Gulf being planned by the Mesa Group and declared its dedication to the continuation of Gulf as an independent major oil company.

\* \* \* \* \* \*

Gulf announced that it has received commitments to increase its lines of credit by $1 billion to a total of $6 billion. On February 10, the Company said that such credit could be used to provide cash for all Gulf stockholders in the event the Mesa Group proceeds with its planned offer. Under the terms of the new credit agreement, use of a substantial portion of the lines of credit for repurchase of Gulf shares would result in a lien on substantially all of Gulf's domestic exploration, production and refining assets. Such usage would also create significant restrictions on divestitures, dividend payments, and future borrowings.

I may assume for present purposes that this press release constituted a "recommendation ... to reject a tender offer" under Section 14(d)(4) even though Mesa had not announced a tender offer at the time of its dissemination. If a recommendation, it was a recommendation with respect to a $55 tender offer which concededly is not being pursued at this time. Accordingly, there is no irreparable injury currently being threatened by the February 14th release which could justify *pendente lite* relief.

■ Mesa's second argument is that Gulf's second application to this Court for a TRO and its February 23rd broadtape release constituted declarations of management's opposition to Mesa's $65 per share

offer and, accordingly, triggered Gulf's obligation to file a Schedule 14D–9.

Gulf's second TRO application came after the close of business on February 22, 1984. Both it and Gulf's February 23rd broadtape release [2] came one full business day before Gulf filed its Schedule 14D–9. Once again, I assume, without deciding, that these actions constituted "recommendations." While Rule 14D–9 requires that the schedule be filed "on the date such solicitation or recommendation is first published," the question posed by Mesa's request for injunctive relief is whether there are continuing effects of this one day delay which threaten irreparable injury avoidable through such relief. I think not.

The purpose of Section 14(d) is to insure that the holders of securities will have sufficient information to make informed decisions on what action to take in response to a tender offer. There is no reason to believe that the information disclosed in Gulf's Schedule 14D–9 filing of February 24th will not be disseminated in ample time for it to serve the purpose which Congress intended. Not only was Gulf's alleged tardiness brief; it came at a time when Mesa was just getting its tender materials on the street.

In short, the record indicates that there is simply no continuing injury from the alleged violations. *Rondeau v. Mosinee Paper Corp., supra,* presented the Supreme Court with a similar situation.[3] As earlier noted, The Court concluded that injunctive relief was inappropriate. *Id.* at 59, 95 S.Ct. at 2076. Given the present record,

I reach the same conclusion with regard to Gulf's second TRO application and February 23rd broadtape release.

■ Mesa's third argument likewise involves an alleged Section 14(d) violation which has at best a *de minimis* continuing effect. It correctly points out that Gulf's Schedule 14D–9 reported as follows:

On February 10 and February 13, 1984, the Human Resources Committee of the Board of Directors of Gulf Oil Corporation awarded grants under Gulf Oil Corporation's Incentive Compensation Plan in the amount of $7,158,000 and set aside $7,203,100 for additional grants contingent upon a change in control of the Company.

According to Mesa, while these "golden parachute" provisions were in fact adopted by Gulf management, they were adopted on February 24, 1984, after Mesa's $65 per share offer, rather than on February 10th and 13th. The difference, if any, is not sufficiently material to warrant interim relief.

■ Mesa's fourth contention is that Gulf failed to disclose "extensive discussions" it allegedly held with ARCO, as required by Item 7 of Schedule 14D–9. Item 7 reads:

Item 7. Certain Negotiations and Transactions by the Subject Company. (a) If the person filing this statement is the subject company, state whether or not any negotiation is being undertaken or is underway by the subject company in response to the tender offer which relates to or would result in:

2. Gulf contends that the February 23rd release came squarely within the "stop-look-and-listen" exception of Rule 14d–9(e), 17 C.F.R. § 240.14d–9e. Mesa disagrees. While the February 23rd release seems to track Rule 14d–9(e) quite closely, I need not resolve this issue at this point.

3. In *Rondeau,* the tender offeror admitted committing clear (albeit unknowing) violations of the Williams Act when he purchased in excess of five percent of the target company's stock without filing the required Schedule 13D disclosure statement. When made aware of his obligation to file a Schedule 13D, the offeror did so. The District Court found that while the offeror had violated the law, no harm was shown and

the offeror's eventually filed Schedule 13D made all necessary disclosures. It, therefore, refused to grant injunctive relief. The Court of Appeals reversed. The Supreme Court reversed the Court of Appeals. The Court found that "[o]n this record there is no likelihood that [the target's] shareholders will be disadvantaged should the [offeror] make a tender offer, or that respondent will be unable to adequately place its case before them should a contest for control develop. Thus the usual basis for injunctive relief ... is not present." *Id.* Since the record shows no irreparable injury here, injunctive relief is similarly inappropriate.

(1) An extraordinary transaction such as a merger or reorganization, involving the subject company or any subsidiary of the subject company;

(2) A purchase, sale or transfer of a material amount of assets by the subject company or any subsidiary of the subject company;

(3) A tender offer for or other acquisition of securities by or of the subject company; or

(4) Any material change in the present capitalization or dividend policy of the subject company.[4]

(b) Describe any transaction, board resolution, agreement in principle, or a signed contract in response to the tender offer, other than one described pursuant to Item 3(b) of this statement, which relates to or would result in one or more of the matters referred to in Item 7(a)(1), (2), (3) or (4).

The record reveals nothing which, as of February 22nd through 24th, could accurately be described as negotiations between Gulf and ARCO concerning a transaction within the scope of Item 7. Moreover, it reveals no communication between the two "in response" to Mesa's $65 tender offer.

On January 22nd, Mr. Anderson met with Mr. Lee and expressed an interest in exploring a possible merger of Gulf into ARCO. He was told that Gulf had no interest in such an arrangement. On February 1st, Mr. Anderson reiterated the same interest during a telephone conversation and informed Mr. Lee that he had mentioned a $70 price to Mr. Pickens; Mr. Lee did not pursue the matter, however. While the Gulf Board on February 10th authorized Mr. Lee to secure further information about ARCO's interest, he did not do so. The final pre-filing contact between ARCO and Gulf came on February 13th, when Mr. Anderson telephoned Mr. Lee. During that conversation Mr. Lee asked if

Mr. Anderson had talked with ARCO's board concerning the subject of their meeting in Denver on January 22nd. Mr. Anderson told Mr. Lee that he had and that the board had expressed general interest. Mr. Lee ended the conversation by saying that if Gulf decided to pursue the possibility of an ARCO/Gulf merger, detailed discussions would be necessary. On this record, I cannot conclude that Mr. Lee negotiated anything with ARCO, much less a transaction "in response" to a tender offer first announced on February 22nd.

■ Mesa's final Section 14(d) claim is based on Gulf's failure to report in its Schedule 14D–9 filing that two of its officers had exercised stock appreciation rights ("SARs") at prices below Mesa's $65 per share figure. The record indicates that Mr. Walker exercised his SARs in late October or early November of 1983 when the market price of Gulf was $47. Mr. Hammer exercised SARs on February 10, 1984 when the market was at $57 per share. Under Gulf's executive compensation plan, an SAR entitles the holder to receive, upon exercise, the difference between the exercise price and the market value of the company's stock at the time of the exercise, usually in the form of cash or stock of the company or a combination of the two. In these instances, Messrs. Hammer and Walker, by determination of the Salary and Compensation Committee of the Board of Directors, only had the right to receive cash.

Mesa asserts that Item 6 of Schedule 14D–9 required Gulf to report Mr. Hammer's SAR activity and that Item 8 required it to report the SAR activity of both officers. Item 6 reads, in part, as follows:

Item 6. Recent Transactions and Intent With Respect to Securities. (a) Describe any transaction in the securities referred to in Item 1 which was effected

---

**4.** Schedule 14D–9 contains the following instruction:

"Instruction: If no agreement in principle has yet been reached, the possible terms of any transaction or the parties thereto need not be discussed if in the opinion of the Board of Directors of the subject company such disclosure would jeopardize continuation of such negotiations. In such event, disclosure that negotiations are being undertaken or are underway and are in the preliminary stages will be sufficient."

during the past 60 days by the person(s) named in response to Item 3(a) and by any executive officer, director, affiliate or subsidiary of such person(s).

Item 8 reads:

Item 8. Additional information to be Furnished. Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

Item 6 requires a description of any transaction less than sixty days old by an officer in the securities which are the subject matter of the outstanding tender. Receipt by an officer of cash incentive compensation is not literally a transaction in the tendered for securities even if the amount of such compensation is measured by the difference between the current market price of that security and some historic base price. While courts have been willing to stretch the literal language of the regulations under other Williams Act provisions when necessary to insure fulfillment of their purpose,[5] I see no reason to read Item 6 to mean anything other than the message its wording conveys. The purpose of Schedule 14D–9 in this context is to provide stockholders with information material to any solicitation or recommendation of management with respect to an outstanding tender offer. A description of transactions in the tendered for securities when supplemented by the requirement of Item 8 with respect to information necessary to make the Schedule 14D–9 not misleading is sufficient for this purpose.

The more difficult question is whether the exercises of SARs should have been reported in response to Item 8 given Gulf's assertion that the Mesa "Offer is unfair and inadequate." While I cannot say that a Gulf stockholder considering Mesa's offer might not have some interest in at least Mr. Hammer's exercise of his SAR, I also cannot say that a description of that exercise was necessary to make Gulf's Schedule

14D–9 not misleading. That schedule represented that the "Board of Directors of the Company ... at a meeting held on February 24, 1984 unanimously determined that the Offer is unfair and inadequate and not in the best interests of the Company or its stockholders." It went on to report that this conclusion was based on the Board's view of the present position of Gulf and its long term prospects, the advice of the Company's financial advisors regarding its value, a comparison with other acquisition transactions in the oil industry in recent years, and the fact that Mesa's offer was a partial tender providing no assurance that all shareholders would be able to dispose of their remaining shares at the $65 level. Much of the information relied upon by the Board was not available to Mr. Hammer when he exercised his SARs. The considerations relevant to his decision would appear to be sufficiently disparate from the criteria employed by the board in the context of a tender for control that reference to his decision was not required by Item 8.

## V. MESA'S SECTION 14(e) CLAIM

Section 14(e) of the Exchange Act provides, in pertinent part:

It shall be unlawful for any person to ... engage in any fraudulent, deceptive or manipulative acts or practices in connection with any tender offer....

The Supreme Court has defined the term "manipulation" as "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernest v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976).

According to Mesa, Gulf intentionally created the impression in early February that it was about to make a self tender. In addition, it allegedly concealed that it had determined to oppose any tender offer by anyone. Once again, if these acts constituted a manipulation of the market at the time, it is nevertheless highly unlikely that

---

**5.** *See e.g., Matas v. Siess,* 467 F.Supp. 217 (S.D. N.Y.1979) (construing Section 16(b) and the reg-  ulations promulgated thereunder).

they are having a current effect on the market.

## VI. MESA'S CLAIMS UNDER SECTION 10(b) AND RULE 10b–5 [6]

Mesa claims that the Gulf defendants "have manipulated the price of Gulf stock by means of misrepresentation and half-truths 'in connection with' the Group's open market acquisition of 13% of the outstanding Gulf stock from August 11, 1983, through December 28, 1983." Mesa cites four actions by Gulf that it alleges constituted such manipulation. First, Mesa asserts that Gulf management has insisted that the Gulf shareholders were their foremost concern, when in fact they have been motivated solely by a desire to retain their control at any cost. Second, Mesa claims that statements by the Gulf defendants with respect to their willingness to consider seriously the Royalty Trust Proposal were materially misleading. Third, Mesa alleges that Gulf intentionally misrepresented to the public that Mesa and its cohorts had engaged in illegal conduct. Fourth and finally, Mesa accuses Gulf of having represented to the public that Gulf was unwilling to discuss merger or acquisition possibilities when this was not the case.

■ While the precise meaning of the phrase "in connection with the purchase or sale of any security" can be debated,[7] its scope cannot be broad enough to include the third and fourth categories of conduct relied upon by Mesa. Mesa's third claim—that Gulf misrepresented that Mesa had engaged in illegal conduct—apparently re-

fers to Gulf's initiation of this suit on February 10, 1984, and statements made in connection therewith. The fourth claim—that Gulf misrepresented it was seeking no merger partner—also refers to events in February. Thus both claims deal with conduct that post-dated all of Mesa's purchases of Gulf stock. That conduct clearly could not have played any role in Mesa's purchases.

As for Mesa's argument that Gulf made material misstatements and omissions with respect to its willingness to consider the Royalty Trust Proposal, the referenced conduct, if it relates to Mesa's December 30th proposal, also took place after the Group's last market purchases. If there were misrepresentations in this area in 1983, the Group has an adequate remedy at law and preliminary injunctive relief is unnecessary.

■ Mesa's claim that the Gulf defendants have misrepresented their motive is, in essence, a claim that they have failed to disclose that actions of which the stockholders have been made aware were breaches of fiduciary duty. This is not a Section 10(b)5 claim; it is a state law claim. *Biesenbach v. Guenther*, 588 F.2d 400 (3d Cir.1978). It will, accordingly, be discussed in a subsequent section.

## VII. MESA'S CLAIM UNDER SECTION 9

Mesa claims that Gulf also violated Sections 9(a)(2) [8] and 9(a)(4) [9] of the Exchange

**6.** Section 10(b) of the Exchange Act makes "[i]t unlawful for any person, ... to use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...." 15 U.S.C. § 78j(b). SEC Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) To employ any device, scheme, or artifice to defraud,

(2) To make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

**7.** *See e.g., Ketchum v. Green*, 557 F.2d 1022 (3d Cir.1977).

**8.** Section 9(a)(2) makes it unlawful for any person, directly or indirectly:

To effect, alone or with one or more other persons, a series of transactions in any securi-

**9.** See note 9 on page 1122.

**1122**

Act. It asserts that "[e]ssentially the same facts support Gulf's violation of Section 9 ... as support of the Section 10(b) and Rule 10b–5 violations."

 Sections 9(a)(2) and 9(a)(4) apply only to a person who "effect[s], alone or with one or more persons, a series of transactions in any security" or a "person selling or offering for sale or purchasing or offering to purchase" a security. Nothing in the present record suggests that Gulf is such a person.

## VIII. THE STATE LAW CLAIM

Finally, Mesa asserts that Gulf's directors, in violation of their fiduciary duty, have sought to thwart Mesa's Royalty Trust Proposal, Mesa's tender offer, and other transactions of potential benefit to Gulf stockholders solely because of their interest in perpetuating their own control over Gulf. In response, Gulf's board, which is composed predominantly of outside directors, has tendered plausible explanations for its decisions. The Gulf directors insist that their past resistance to Mesa's overtures resulted from a fundamental difference of opinion about what was in best interest of Gulf and its stockholders. As for the present, they point out that they are currently pursuing a number of opportunities, some of which would result in their losing control of Gulf.

On the present record, I am not prepared to say that Mesa has demonstrated a probability of success on this claim. Moreover, even if there had been a demonstration of some breach of fiduciary duty in the past, it is undisputed that Gulf's management is

currently exploring alterantive proposals for Gulf's future and it should remain free to do so. It is in the best interest of Gulf's stockholders to allow the contest to go forward without judicial interference so that they may have the opportunity to consider any opportunities that may arise and make their own decisions about the future of Gulf and of their relationship to it.[10]

## IX. CONCLUSION

Mesa's application for a preliminary injunction will be denied.

---

ty registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

**9.** Section 9(a)(4) makes it unlawful for any person, directly or indirectly:

If a dealer, or broker, or other person selling or offering for sale or purchasing or offering to purchase the security, to make, regarding any security registered on a national securities exchange, for the purpose of inducing

the purchase or sale of such security, any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which he knew or had reasonable ground to believe was so false or misleading.

**10.** As this Opinion was being typed, Gulf filed a motion to supplement the record to reflect an offer by the Standard Oil Company of California to purchase all outstanding shares of Gulf at $80 per share. This fact does not alter the conclusions set forth herein.